**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| GLOBAL EXPEDITION VEHICLES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civil Action No. 6:15-cv-03296-MDH | |
| | ) | |
| | ) | |
| LOROAD, LLC, and | ) | |
| RODNEY LOUGH JR., | ) | |
| Defendants. | ) | |

## ANSWER AND COUNTERCLAIMS

### ANSWER

Defendant LoRoad, LLC ("LoRoad"), by and through its attorneys, Husch Blackwell

LLP, for its Answer to Plaintiff's Petition filed herein states as follows:

1.      Defendant admits the allegations contained in paragraph 1 of Plaintiff's Petition.

2.      Defendant admits the allegations contained in paragraph 2 of Plaintiff's Petition.

3.      Defendant admits that GXV is a Missouri limited liability company; Defendant is

without sufficient knowledge to form a belief as to the truth or falsity of the remaining

allegations contained in paragraph 3 of Plaintiff's Petition and, therefore, denies same.

4.      Defendant denies the allegations contained in paragraph 4 of Plaintiff's Petition.

5.      Defendant denies the allegations contained in paragraph 5 of Plaintiff's Petition.

6.      Defendant denies the allegations contained in paragraph 6 of Plaintiff's Petition.

7.      Defendant admits that Mr. Lough entered into a non-disclosure agreement with

GXV; Defendant denies the remaining allegations contained in paragraph 7 of Plaintiff's

Petition.

1

8.      Defendant denies the allegations contained in paragraph 8 of Plaintiff's Petition.

9.      Defendant admits the allegations contained in paragraph 9 of Plaintiff's Petition.

10.     Defendant admits the allegations contained in paragraph 10 of Plaintiff's Petition.

11.     Defendant admits the allegations contained in paragraph 11 of Plaintiff's Petition.

12.     Defendant admits that Mr. Lough entered into a non-disclosure agreement with GXV; Defendant denies the remaining allegations contained in paragraph 12 of Plaintiff's Petition.

13.     Defendant admits the allegations contained in paragraph 13 of Plaintiff's Petition.

14.     Defendant admits the allegations contained in paragraph 14 of Plaintiff's Petition.

15.     Defendant admits that Mr. Lough was given a tour of GXV's facility; Defendant denies the remaining allegations contained in paragraph 15 of Plaintiff's Petition.

16.     Defendant admits that Mr. Lough expressed interest in using a "BAE Brazos" vehicle based on suggestions made by GXV and relying upon GXV's expertise in the matter; Defendant denies the remaining allegations contained in paragraph 16 of Plaintiff's Petition.

17.     Defendant denies the allegations contained in paragraph 17 of Plaintiff's Petition.

18.     Defendant is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 18 and therefore denies the same.

19.     Defendant admits the allegations contained in paragraph 19 of Plaintiff's Petition.

20.     Defendant admits that LoRoad identified the features it desired in the Custom Vehicle and that Rodney Lough Jr. and Mike and Rene Van Pelt together marked up a preliminary floor plan depicting the desired layout. Defendant denies the remaining allegations contained in paragraph 20 of Plaintiff's Petition.

21.     Defendant admits the allegations contained in paragraph 21 of Plaintiff's Petition.

2

22.     Defendant admits that changes including additions, deletions, and alterations were made to the Assembly Agreement document and the Build List document regarding various material details; Defendant denies the allegation that changes were only made to the "Build List" document contained in paragraph 22 of Plaintiff's Petition, and denies any remaining allegations of paragraph 22.

23.     Defendant admits the allegations contained in paragraph 23 of Plaintiff's Petition.

24.     Defendant admits the allegations contained in paragraph 24 of Plaintiff's Petition.

25.     Defendant admits that Mr. Lough faxed a marked-up version of the Assembly Agreement and Build List containing comments, questions, and proposed changes. Defendant denies the remaining allegations contained in paragraph 25 of Plaintiff's Petition.

26.     Defendant denies the allegations contained in paragraph 26 of Plaintiff's Petition.

27.     Defendant denies the allegations contained in paragraph 27 of Plaintiff's Petition.

28.     Defendant denies the allegations contained in paragraph 28 of Plaintiff's Petition.

29.     Defendant denies the allegations contained in paragraph 29 of Plaintiff's Petition.

30.     Defendant admits the allegations contained in paragraph 30 of Plaintiff's Petition.

31.     Defendant denies the allegations contained in paragraph 31 of Plaintiff's Petition.

32.     Defendant is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 32 and therefore denies the same.

33.     Defendant admits that it was concerned about the completion date because it was relying on having the completed vehicle in order to accomplish its business and marketing activities; Defendant denies the remaining allegations contained in paragraph 33 of Plaintiff's Petition.

34.     Defendant denies the allegations contained in paragraph 34 of Plaintiff's Petition.

35.     Defendant admits the allegations contained in paragraph 35 of Plaintiff's Petition.

36.     Defendant denies the allegations contained in paragraph 36 of Plaintiff's Petition.

37.     Defendant admits the allegations contained in paragraph 37 of Plaintiff's Petition.

38.     Defendant admits the allegations contained in paragraph 38 of Plaintiff's Petition.

39.     Defendant admits that it requested the most recent proposed versions of the Assembly Agreement and Build List since it had previously requested but still not received a response from GXV regarding some outstanding details to resolve, and denies any remaining allegations of paragraph 39.

40.     Defendant admits that it asserted that the parties did not have a final agreement yet because there were still outstanding material issues to resolve with respect to the Assembly Agreement and the Build List and because no representative of LoRoad had signed the Assembly Agreement; Defendant denies Plaintiff's oversimplified characterization of the status of the negotiations, and denies any remaining allegations of paragraph 40.

41.     Defendant admits that it informed GXV that no representative of LoRoad had signed the Assembly Agreement and that there were still outstanding issues to discuss and resolve. To the extent the allegations in this paragraph suggest otherwise, Defendant denies such allegations, and denies any remaining allegations of paragraph 41.

42.     Defendant admits the allegations contained in paragraph 42 of Plaintiff's Petition.

43.     Defendant admits the allegations contained in paragraph 43 of Plaintiff's Petition.

44.     Defendant denies the allegations contained in paragraph 44 of Plaintiff's Petition.

45.     Defendant admits that it became necessary to retain counsel due to GXV's conduct and that its counsel attempted to obtain a return of LoRoad's deposit based on lack of a final agreement or, in the alternative, adequate performance from GXV in response to and in

4

reliance on GXV's repeated assertion that they had a binding contract to build an expeditionary vehicle for LoRoad; Defendant denies the remaining allegations of paragraph 45.

46.     Defendant admits the allegations contained in paragraph 46 of Plaintiff's Petition.

47.     Defendant admits the allegations contained in paragraph 47 of Plaintiff's Petition.

48.     Defendant admits the allegations contained in paragraph 48 of Plaintiff's Petition.

49.     Defendant admits the allegations contained in paragraph 49 of Plaintiff's Petition.

50.     Defendant admits the allegations contained in paragraph 50 of Plaintiff's Petition.

51.     In response to the allegations contained in paragraph 51 of Plaintiff's Petition, Defendant repeats and realleges its responses to the paragraphs preceding these paragraphs as though fully set forth herein and incorporates the same by reference.

52.     Defendant admits the allegations contained in paragraph 52 of Plaintiff's Petition.

53.     Defendant admits the allegations contained in paragraph 53 of Plaintiff's Petition.

54.     Defendant admits the allegations contained in paragraph 54 of Plaintiff's Petition.

55.     Defendant denies the allegations contained in paragraph 55 of Plaintiff's Petition.

56.     Defendant denies the allegations contained in paragraph 56 of Plaintiff's Petition.

57.     In response to the allegations contained in paragraph 57 of Plaintiff's Petition, Defendant repeats and realleges its responses to the paragraphs preceding these paragraphs as though fully set forth herein and incorporates the same by reference.

58.     Defendant denies the allegations contained in paragraph 58 of Plaintiff's Petition.

59.     Defendant denies the allegations contained in paragraph 59 of Plaintiff's Petition.

60.     Defendant denies the allegations contained in paragraph 60 of Plaintiff's Petition.

61.     Defendant denies the allegations contained in paragraph 61 of Plaintiff's Petition.

SPH-2140463-1

62.     In response to the allegations contained in paragraph 62 of Plaintiff's Petition, Defendant repeats and realleges its responses to the paragraphs preceding these paragraphs as though fully set forth herein and incorporates the same by reference.

63.     Defendant admits that Mr. Lough signed a non-disclosure agreement with GXV governing the use and disclosure of proprietary information.  To the extent the allegations of this Paragraph do not fully represent the actual terms of the non-disclosure agreement, Defendant denies such allegations, and denies any remaining allegations of paragraph 63.

64.     Defendant denies the allegations contained in paragraph 64 of Plaintiff's Petition.

65.     Defendant denies the allegations contained in paragraph 65 of Plaintiff's Petition.

66.     Defendant denies the allegations contained in paragraph 66 of Plaintiff's Petition.

67.     Defendant denies the allegations contained in paragraph 67 of Plaintiff's Petition.

68.     Defendant denies the allegations contained in paragraph 68 of Plaintiff's Petition.

69.     Defendant denies the allegations contained in paragraph 69 of Plaintiff's Petition.

70.     Defendant denies the allegations contained in paragraph 70 of Plaintiff's Petition.

71.     Defendant repeats and realleges its responses to the paragraphs preceding these paragraphs as though fully set forth herein and incorporates the same by reference, and denies any remaining allegations of paragraph 71.

72.     Defendant denies the allegations contained in paragraph 72 of Plaintiff's Petition.

73.     Defendant admits that Mr. Lough has asserted that GXV/the Van Pelts have made certain false statements regarding the subject matter of this lawsuit. Defendant denies the remaining allegations, and denies any remaining allegations of paragraph 73.

74.     Defendant denies the allegations contained in paragraph 74 of Plaintiff's Petition.

75.     Defendant admits the allegations contained in paragraph 75 of Plaintiff's Petition.

SPH-2140463-1

76.     Defendant admits that Mr. Lough identified GXV and/or Mike or Rene as making certain false statements. To the extent the allegations of this Paragraph reference alleged statements and/or publications that Mr. Lough did not make, Defendant denies these allegations, and denies any remaining allegations of paragraph 76.

77.     Defendant is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 77 of Plaintiff's Petition and therefore denies the same.

78.     Defendant denies the allegations contained in paragraph 78 of Plaintiff's Petition.

79.     Defendant denies the allegations contained in paragraph 79 of Plaintiff's Petition.

80.     Defendant denies the allegations contained in paragraph 80 of Plaintiff's Petition.

81.     Defendant is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 81 of Plaintiff's Petition and therefore denies the same.

82.     Defendant is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 82 of Plaintiff's Petition and therefore denies the same.

83.     Defendant denies the allegations contained in paragraph 83 of Plaintiff's Petition.

84.     Defendant denies the allegations contained in paragraph 84 of Plaintiff's Petition.

## AFFIRMATIVE DEFENSES

a.      Plaintiff's Petition fails to state a claim against LoRoad upon which relief can be granted.

b.      Plaintiff's claims are barred by the doctrines of waiver, estoppel, laches, unclean hands and/or acquiescence.

c.      Plaintiff is not an aggrieved person with respect to some or all of the causes of action alleged in the Petition, and therefore Plaintiff lacks standing to sue.

d.      The damages sought by Plaintiff are not recoverable because Plaintiff has failed to mitigate its damages, if any.

e.      Pursuant to F.R.C.P. 11, as amended, all possible affirmative defenses may not have been alleged insofar as sufficient facts were not available after reasonable inquiry upon filing of Defendant's Answer and therefore, Defendant reserves the right to amend this Answer to allege additional affirmative defenses, if subsequent investigation so warrants.

f.      Plaintiff's claims are barred by the statute of limitations.

g.      Plaintiff's Petition, to the extent that it seeks punitive damages, violates Defendant's right to procedural due process under the Fourteenth Amendment of the United States Constitution and the Constitution of the State of Missouri and, therefore, fails to state a cause of action upon which punitive damages can be awarded.

WHEREFORE, Defendant, LoRoad, LLC prays for judgment as follows:

1.      That Plaintiff take nothing by way of its Petition on file herein and that the Court enter judgment in favor of LoRoad on Plaintiff's claims;

2.      For reasonable attorney's fees and costs incurred herein; and

3.      For such other and further relief as this Court deems just and proper.

## COUNTERCLAIMS

LoRoad, LLC ("LoRoad"), by and through its counsel, Husch Blackwell, for its Counterclaim against Global Expedition Vehicles, LLC ("GXV"), complains and alleges as follows:

## PARTIES

1.      LoRoad LLC ("LoRoad") is an Oregon limited liability company with its principal place of business located at 16735 SE Ken's Court, Suite D, Milwaukie, OR 97267.

Among other activities, it is engaged in the business of displaying and selling the work of wilderness photographer Rodney Lough, Jr.

2.     Global Expedition Vehicles, L.L.C. ("GXV") is a Missouri limited liability company with its principal place of business at 1520 N. Commercial Road, Nixa, MO 65714.

3.     GXV is engaged in the business of manufacturing and assembling custom-built self-sufficient expedition vehicles.

ALLEGATIONS COMMON TO ALL COUNTERCLAIMS

4.     Rodney Lough Jr. ("Rodney") is a professional wilderness photographer whose livelihood, and that of his family, is derived exclusively from his photography.

5.     Rodney was authorized by LoRoad to conduct negotiations with GXV regarding building a custom expedition vehicle ("Custom Vehicle") for LoRoad.

6.     Michael Van Pelt ("Mike") is an owner of GXV.

7.     At all times relevant herein, Mike was an agent, owner, and/or employee of GXV and was an authorized representative of GXV. At all times relevant herein, Mike was acting within the course and scope of his position as an agent, owner, and/or employee of GXV.

8.     Rene Van Pelt ("Rene") is an owner of GXV.

9.     At all times relevant herein, Rene was an agent, owner, and/or employee of GXV and was an authorized representative of GXV. At all times relevant herein, Rene was acting within the course and scope of her position as an agent, owner, and/or employee of GXV.

10.     Many of the wilderness locations that Rodney photographs are only accessible by specialized vehicles due to their remote geography and difficult terrain. Ordinary recreational vehicles do not have the capability to traverse such terrain, and other all-terrain vehicles do not

have the capacity to carry sufficient food, water, shelter, equipment, and supplies to these locations for the necessary extended periods of time.

11.     LoRoad became aware of specialized expedition vehicles that could be custom-built which were capable of traversing nearly any type of terrain and that could provide comfortable shelter from the elements as well as carry all enough food, water, fuel, and other supplies for weeks-long expeditions into the back-country.

12.     LoRoad desired to acquire an expedition vehicle in order to enable Mr. Lough to further his photography work in traveling to and from shooting locations throughout North America, including the United States.

13.     LoRoad also desired to acquire an expedition vehicle in order to promote and advertise a new app for mobile devices that Rodney had developed and released as well as to market and advertise Mr. Lough's photography.

14.     LoRoad also desired to utilize the expedition vehicle in a featured role in a reality television series in which it had invested significant resources to develop and which was to be pitched to television networks and producers.

15.     LoRoad learned about GXV through online postings on an internet forum dedicated to enthusiasts and professionals in the expedition vehicle industry.

16.     On or about September 5, 2012, LoRoad contacted GXV by telephone regarding the possibility of GXV building an expedition vehicle that would meet its criteria. After some discussion, LoRoad was informed by GXV that it could build such a vehicle (the "Custom Vehicle").

17.     LoRoad informed GXV that it wanted a cab-height lifting roof on its Custom Vehicle. With this style, the roof could be lowered while traveling to conserve fuel and to allow

the vehicle to fit into spaces not possible with a full-height roof. The roof would be raised by mechanical or other means to provide more interior space for sleeping, working, etc.

18.     LoRoad and GXV began a series of discussions and negotiations regarding the "Custom Vehicle" and the terms and conditions of a proposed agreement. These discussions and negotiations began in September of 2012 and spanned through February of 2013.

19.     The communication between LoRoad in Oregon and GXV in Missouri occurred via telephone, email, and fax primarily between Rodney on behalf of LoRoad and Rene on behalf of GXV.

20.     Prior to the time that LoRoad and GXV began discussions, expedition vehicles had been successfully built by various custom-vehicle manufacturers, including GXV, using Unimog brand trucks as the base vehicle.

21.     During the discussions between LoRoad and GXV, it was determined that GXV's Pangea model of expedition vehicle would be well-suited to fit LoRoad's needs.

22.     The Pangea model could be built on a Unimog U500 as a base vehicle.

23.     LoRoad and GXV discussed the possibility of using a Unimog U500 truck as the base for the Custom Vehicle. GXV indicated that it would work and that it was aware of a U500 that was, or would soon be, available for sale that had all the options a person could want.

24.     GXV informed LoRoad that it preferred to wait until a signed contract was in place before it acquired a base vehicle, but that it understood that it was a cost of doing business to acquire an ideal base vehicle at a good price only to have a potential customer back out of the deal before signing a contract.

25.     On or about September 7, 2012, LoRoad requested more information from GXV regarding the U500 that GXV had mentioned might be available.

11

26.      That same day, GXV promised to send blueprints of a cab-height lifting roof in exchange for a signed non-disclosure agreement. Rodney signed a non-disclosure agreement and sent it to GXV that same day.

27.      The following day, Rene confirmed receipt of the signed non-disclosure agreement and indicated that Mike would review the drawings that would then be sent to LoRoad.

28.      On or about September 8, 2012, GXV sent a single drawing comprising four pages, of a smaller pick-up based model of an expedition vehicle with a floor plan and dimensions that were different from what LoRoad would be receiving.

29.      LoRoad then sent GXV a drawing Rodney created using the design software known as SketchUp, depicting a lifting bed and asked if GXV could do something like that on a Unimog U500 build. GXV replied that they could.

30.      LoRoad asked again on September 10, 2012 if GXV had located the Unimog U500 truck they had previously mentioned.

31.      On September 12, LoRoad contacted GXV and noted that they still hadn't provided any additional information about the U500 as requested. GXV responded that it is always on the lookout for a U500 but that they didn't have any details a particular one for sale right now.

32.      On or about September 19 through 21, Rodney visited GXV's facilities at which time the parties discussed his specific requirements and ideas for the Custom Vehicle.

33.      During Rodney's visit to GXV, the parties marked up a drawing of a floorplan for a different model of expedition vehicle, noting changes and additions that LoRoad desired for its Pangea Custom Vehicle.

34. During the visit, GXV informed Rodney that it has been involved in a reality television show in which some of the custom vehicles that they build are featured. Rene stated to Rodney that she has been in communication with various television producers from the Travel Channel regarding featuring their builds.

35. LoRoad, via Rodney, informed GXV that it would like to have its Custom Vehicle featured on a television show.

36. On or about September 21, 2012, GXV stated that after all of the options are decided, a contract would be written up and then the drawing GXV previously sent to LoRoad would be re-drawn to account for the larger-sized base vehicle and for the unique options and layout that LoRoad desired. New interior elevations would then be created for the Custom Vehicle.

37. The proposed agreement to build the Custom Vehicle for LoRoad was titled "Assembly Agreement". The Assembly Agreement incorporated a "Build List" and "Preliminary Floor Plan". All of these documents together in final form were to constitute the agreement.

38. The price of the Custom Vehicle was anticipated to be between $400,000 and $500,000. It was also anticipated that payment of a $120,000 deposit would be required within ten days after execution of the Agreement.

39. Upon learning of the anticipated price, Rodney indicated to GXV that it was approximately $150,000 higher than what LoRoad had budgeted, but that GXV's connections with the Travel Channel would make the difference between backing out and going forward with the higher-than-anticipated price.

40. On September 23, 2012, LoRoad sent GXV another SketchUp drawing of what it envisioned the Custom Vehicle would look like, drawn to scaled dimensions.

13

41.     The next day, GXV stated in an email from Rene to LoRoad that a Travel Channel producer had reached out to GXV wanting more information about the LoRoad Custom Vehicle build project. Rene indicated that this may be a sign that "the stars are aligning" for LoRoad.

42.     LoRoad responded by asking GXV to share Rodney's contact information with the Travel Channel producer as well as a link to some video footage of Rodney working in the field.

43.     During Rodney's visit to GXV's facilities, Mike and Rene suggested to Rodney that LoRoad consider using a BAE brand truck chassis as a base vehicle for its build. LoRoad agreed to consider using a BAE.

44.     On September 29, 2012, GXV emailed LoRoad to say that it had a couple options to acquire a BAE truck chassis and needed to inform the manufacturer within a week if it wished to do so.

45.     On or about October 1, 2012, GXV informed LoRoad via email that an appropriate base vehicle on which the LoRoad Custom Vehicle could be built – a 2001 BAE (S&S) 6x6, serial number 013626AF14J – was available for GXV to purchase from the manufacturer, BAE, for $110,000, part of which would be offset by $70,000 trade-in value of LoRoad's current pickup and camper.

46.     That same evening, GXV emailed LoRoad a proposed Assembly Agreement with Build List and a "Preliminary Floor Plan". The Preliminary Floor Plan depicted a different model, but it was the same one floor plan that the parties had marked up with changes and additions when Rodney had visited GXV's facilities. The floor plan attached as part of the proposed agreement, however, did not contain any indications of those changes and additions.

14

47.     On October 2, 2012, GXV emailed LoRoad a brochure depicting BAE base vehicles similar to the one they recommended for LoRoad's build. The brochure indicated EPA 2010/FMVSS or equivalent environmental compliance.

48.     On October 9, 2012, LoRoad faxed a copy of the proposed agreement back to GXV marked up with numerous questions, comments, and requested changes regarding material terms of the agreement.

49.     LoRoad specifically stated on the marked-up proposed agreement that it needs to provide that the Custom Vehicle will be registered in Missouri and then titled and registered in Oregon.

50.     LoRoad also included a proposed term stating that the assembler (GXV) will make all best efforts to have this build used in any television show that may be interested in featuring a GXV build.

51.     LoRoad also specifically noted that the "Preliminary Floor Plan" submitted by GXV as part of the proposed agreement was not the final version that Rodney and Mike had marked up while Rodney was at GXV's facilities. LoRoad emailed a copy of the marked-up version to GXV.

52.     On or about October 10, 2012, GXV sent an email to LoRoad acknowledging receipt of LoRoad's proposed changes and questions. Rene stated in the email that she had more updates to pass along about discussions with television producer(s).

53.     That same day, GXV replied to some of LoRoad's questions and proposed changes. Specifically in response to LoRoad's note regarding registration of the Custom Vehicle, Rene stated that "Your BAE XV will be sold to you on a MOTOR VEHICLE BILL OF SALE".

15

54.    On October 15, 2012, LoRoad requested a spec sheet for the specific BAE 6x6 vehicle that was identified as the base vehicle in the proposed agreement. GXV replied that they don't have anything like that other than the outdated brochure already provided.

55.    On October 15, 2012, GXV promised via email to put together specs for the BAE vehicle identified in the agreement.

56.    On October 17, GXV sent an email to LoRoad indicating that Mike had talked about another GXV project like LoRoad's build that would be built about the same time.

57.    That same day, LoRoad sent an email to GXV again stating that the Custom Vehicle will be titled and registered in Oregon and LoRoad just wants to make sure there are no problems in this regard because it doesn't want to "purchase this and then not be able to drive it around."

58.    In response to LoRoad's concern about titling and registering the Custom Vehicle, GXV assured LoRoad in an email from Rene that LoRoad will be purchasing a "GXV BAE Pangea motorhome" on a DMV Bill of Sale as a completed finished unit. Rene stated that the alternative would be for LoRoad to provide its own chassis and GXV just provides the body; but in that case, LoRoad would be on its own as far as registering the vehicle is concerned.

59.    During a telephone call between Rodney and Mike on October 17, 2012 Mike indicated that he is okay including LoRoad's proposed language regarding GXV's best efforts to have the Custom Vehicle featured on television in the agreement.

60.    On October 18, LoRoad inquired about the expected build time and completion date for its Custom Vehicle. LoRoad stated that "we are still moving forward on our TV show and we really need the vehicle". LoRoad again reiterated its understanding that the Custom

Vehicle will be titled and registered by GXV and that the title and registration will be transferred to Oregon.

61.     On October 23, 2012, Rene texted Rodney while he was in the field working and told him that "the TV producers are back on the phone with us. Are you in"?? She also stated that "we are moving along with the TV thing."

62.     On or about October 24, 2012, during a telephone call between Rodney and Rene, Rene informed Rodney that the TV producers wanted assurance that LoRoad was committed to the build project and that LoRoad would need to pay a substantial amount to demonstrate its commitment, even though the Assembly Agreement was still not finalized or executed.

63.     On October 31, 2012, GXV emailed bank wire transfer instructions to LoRoad along with a re-revised version of the Assembly Agreement for LoRoad's review and comment.

64.     At the time, the Assembly Agreement still did not include the finalized version of the floor plan that LoRoad had requested showing the changes and additions Rodney and Mike had made.

65.     In reliance upon GXV's representation regarding the producers' requirement, on November 2, 2012, LoRoad wired a good-faith deposit in the amount of $120,000 from its account at Wells Fargo Bank in Milwaukie, Oregon to GXV's account at Great Southern Bank in Springfield, Missouri.

66.     On November 6, 2012, GXV acknowledged receipt of the $120,000 from LoRoad.

67.     That same day, LoRoad emailed GXV asking to discuss several issues that had still not been dealt with in the most recent revision of the proposed agreement.

68. GXV replied to LoRoad's request via email from Rene later that day, stating that LoRoad can call to discuss or just mark up the documents and fax or email them as had become the usual practice.

69. On November 12, 2012, GXV stated via email from Rene that it had a signed Bill of Sale as well as Terms and Conditions from BAE for the purchase of the base vehicle identified in the proposed agreement.

70. Upon information and belief, BAE sold the 2001 BAE base vehicle identified in the proposed Assembly Agreement to GXV with certain geographical restrictions precluding its resale by GXV for use in the United States because, due to environmental regulations, the vehicle could not be operated legally on public roads in the United States.

71. GXV was aware of the "not-in-the-United States" geographical restriction on the resale of the 2001 BAE base vehicle, but GXV falsely represented to LoRoad that the finished Custom Vehicle built on the 2001 BAE base vehicle could be legally titled and operated in Oregon and the United States.

72. On or about November 15, 2012, LoRoad faxed to GXV a copy of the proposed Assembly Agreement including the Build List and Preliminary Floor Plan with additional questions and disagreements.

73. On November 30, 2012, GXV sent an email to LoRoad providing responses to some, but not all, of the issues raised by LoRoad on the marked-up version of the proposed Assembly Agreement that LoRoad faxed to GXV on or about November 15, 2012. GXV still did not respond to LoRoad's multiple prior requests to include the marked up preliminary floor plan that Rodney and Mike had created into the Agreement.

74. That same day, LoRoad emailed GXV stating that if GXV was unwilling to change the agreement to reflect the previously agreed-upon changes and additions to the preliminary floor plan, then LoRoad would have to bow out of the deal.

75. Without responding to LoRoad's concerns about the proposed floor plan, GXV emailed LoRoad on December 6 stating that they're still working with BAE on getting the truck shipped from BAE's facilities to theirs.

76. On December 10, 2012, LoRoad sent an email to GXV expressing additional concerns and reiterated that the language regarding the proposed floor plan must be changed or there won't be an agreement between the parties.

77. On December 11, 2012, GXV sent a revised Build List to LoRoad via email. In the email, Rene stated that once it's all agreeable to LoRoad, GXV will revise the Assembly Agreement accordingly and send all of the documents comprising the Assembly Agreement together as one package.

78. Later that day, GXV and LoRoad emailed back and forth discussing additional concerns and questions that still had not been resolved to LoRoad's satisfaction.

79. On December 13, 2012, LoRoad emailed GXV expressing concerns and reservations about the LoRoad build being the first of its kind completed by GXV. LoRoad also asked for an update regarding discussions with TV producers.

80. GXV replied to LoRoad's concern that same day stating that the LoRoad build would not be GXV's first cab-height Pangea and inferred that it would not be the first one built on a BAE chassis.

SPH-2140463-1

81.     On December 15, 2012, LoRoad emailed GXV requesting answers to all of the outstanding questions and concerns it had previously expressed or else it would be pulling out and would want its deposit returned.

82.     LoRoad subsequently asked two more times for GXV to clarify that it will be building a "Pangea lifting roof" on a BAE chassis before building one for LoRoad.

83.     GXV replied on December 19, 2012 stating that it was not planning to do so but that it could build a "cab-height Pangea" first if that would make LoRoad feel better.

84.     Despite LoRoad asking for an explanation of the difference between a "cab-height" versus a regular Pangea, GXV never provided an explanation.

85.     After some additional back and forth regarding the project, LoRoad emailed GXV on February 11, 2013 and requested a copy of the latest version of the Assembly Agreement, including the Build List and Preliminary Floor Plan for review and comment.

86.     On February 13, 2013, GXV replied via email from Rene claiming that the contract had already been signed by LoRoad's representative on November 15, 2012 and that any changes to the Build List portion after October 31, 2012 would be considered change orders.

87.     GXV acknowledged in the February 13, 2013 email that the Build List portion of the agreement was still being negotiated after November 15, 2012.

88.     Upon request from LoRoad, GXV subsequently emailed a copy of the Assembly Agreement portion purportedly signed by LoRoad's representative LeeAnna Lough.

89.     LoRoad responded by explaining that the signature was not that of LeeAnna Lough, but rather her name written in print letters on the document to be inserted in the final agreement as the person who would eventually sign on behalf of LoRoad. This page was part of

the marked-up set of documents with questions, comments, and proposed changes that LoRoad had faxed to GXV on or about November 15, 2012.

90.     In a February 18, 2013, phone call between Rodney and Rene, GXV stated that it would send a revised Assembly Agreement incorporating the latest changes to LoRoad by the end of the day.

91.     On February 20, 2013, having still not received the promised revised Assembly Agreement, LoRoad emailed GXV asking when to expect it.

92.     The next day, GXV emailed a reply to LoRoad stating that its attorney is drafting the revised Assembly Agreement.

93.     On February 22, 2013, GXV sent a document titled "Assembly Agreement Addendum #1" to LoRoad for LoRoad's review and signature.

94.     LoRoad responded that because it had not executed an Assembly Agreement yet there could not be an addendum and so it was unwilling to negotiate or sign on that basis.

95.     In subsequent discussions with LoRoad and eventually with LoRoad's own counsel, GXV continued to maintain that it already had a binding contract, despite the fact that negotiations regarding the details of the proposed LoRoad build project and despite GXV's February 18, 2013 oral promise via Rene to revise the Assembly Agreement.

96.     Orally and in multiple versions of the Assembly Agreement, GXV represented that it would take approximately 8 months to build the Custom Vehicle. The November 15, 2012 version of the Assembly Agreement which was signed by Mike Van Pelt contemplated that the Custom Vehicle would be completed by May 2013.

97.     By the spring of 2013, however, many months that had lapsed since LoRoad's provision of a good-faith deposit, and GXV had not provided even the most basic engineering

drawings for the Custom Vehicle. As a result, LoRoad reasonably became insecure regarding GXV's performance, timely or otherwise, under the parties' agreement.

98.     On March 15, 2013, four and a half months after paying the good-faith deposit, LoRoad demanded adequate assurance of GXV's due performance under the parties' agreement as per U.C.C. Art. 2 § 609. LoRoad allowed GXV the statutory thirty days to provide such assurance; but GXV failed to provide any assurance in response.

99.     Instead, on April 5, 2013, GXV indicated that, without any input from LoRoad, engineering on the Custom Vehicle had been "completed," and certain of LoRoad's long-standing requirements would not be accommodated. Despite requests from LoRoad, GXV never provided any engineering drawings of the Custom Vehicle to LoRoad.

100.    To date, GXV has provided to LoRoad no evidence of any work done on the Custom Vehicle.

101.    All versions of the Assembly Agreement exchanged by the parties, specifically including the Nov. 15 version which was signed by Mike on behalf of GXV, provided that all disputes related to the Assembly Agreement be settled by binding arbitration.

102.    As a result of GXV's continued failure to provide adequate assurance that it was working on the Custom Vehicle, and in reliance on GXV's continued insistence that the Nov. 15 version of the Assembly Agreement bearing Mike's signature was the parties' "contract," coupled with LoRoad's belief that the Nov. 15 version Assembly Agreement at least contained most of the terms upon which the parties had agreed (including an agreement to arbitrate disputes), on April 29, 2013, LoRoad sent a letter to GXV seeking GXV's agreement to arbitrate the dispute before the Judicial Arbitration and Mediation Service.

103.    After numerous delays on GXV's part, more than six weeks after LoRoad requested arbitration, counsel for GXV responded that the GXV principals were on vacation and that the matters in the case were outside that counsel's expertise.

104.    Seven weeks after LoRoad sent GXV a request to stipulate to arbitration, and in reliance upon the provision in the Nov. 15 version of the Assembly Agreement requiring arbitration of disputes, LoRoad filed a petition to compel arbitration in the United States District Court for the Western District of Missouri on June 18, 2013.

105.    GXV filed a motion to dismiss the petition on July 16, 2013. GXV's motion to dismiss was denied on March 21, 2014.

106.    On August 1, 2013, LoRoad moved for summary judgment compelling arbitration.

107.    On April 4, 2014, GXV cross-moved for summary judgment, contending for the first time that there was no contract between the parties.

108.    On June 12, 2014, the Missouri court denied LoRoad's motion for summary judgment and granted GXV's motion for summary judgment, finding that there was no agreement to arbitrate. LoRoad appealed the decision of the district court.

109.    The Eighth Circuit Court of Appeals denied LoRoad's appeal and affirmed the district court's decision.

110.    The Eighth Circuit Court, in its opinion, confirmed what LoRoad had asserted in the very beginning of the dispute underlying this litigation—that LoRoad had not accepted the 11/15/13 version of the Assembly Agreement and therefore there was no enforceable contract between LoRoad and GXV.

111.    To date, GXV has not returned LoRoad's $120,000 deposit.

SPH-2140463-1

CLAIMS FOR RELIEF

COUNT I

(Fraudulent Misrepresentation - Base Vehicle)

112.     LoRoad realleges and incorporates paragraphs 1 through 111 as if set forth herein.

113.     As set forth above, GXV represented to LoRoad that the finished Custom Vehicle, including the 2001 BAE base vehicle with which the Custom Vehicle would be built, would be legal to register and operate on public roads in the United States.

114.     On information and belief, BAE sold the 2001 BAE base vehicle to GXV with an explicit geographic restriction on its resale due to the fact that environmental regulations disallowed the registration and operation of the BAE base vehicle on public roadways in North America in general and in the United States in particular.

115.     LoRoad specifically noted to GXV that it desired to purchase a Custom Vehicle for use in Oregon and throughout the United States, and that it did not want to purchase a Custom Vehicle that was not legal to operate in these areas.

116.     Upon information and belief, GXV was aware of and was required to agree to certain terms and conditions, including the geographic restrictions described above, when it purchased the 2001 base vehicle from BAE.

117.     GXV knew that LoRoad required that the Custom Vehicle be legal to operate on public roads in Oregon and throughout the United States, and GXV intended that LoRoad would rely on its representations that the Custom Vehicle would in fact be legal to operate on public roads in Oregon and throughout the United States.

24

118. LoRoad was unaware of the geographic restrictions on resale in the contract between GXV and BAE. Had it known, LoRoad would not have paid a deposit or agreed to the use of the BAE chassis as a base vehicle.

119. GXV falsely represented to LoRoad that the proposed Custom Vehicle would meet state and federal safety standards and that it could be registered in Missouri and in Oregon, and that it would be legally operable on United States highways.

120. LoRoad relied on the representations of GXV that the Custom Vehicle would be legal to operate on public roads in Oregon and throughout the United States.

121. GXV touted itself as having "vast experience in building world-class Expedition Vehicles" and as "recognized globally as being one of the leaders in this industry." As a result, LoRoad reasonably and rightfully relied upon GXV's representations regarding the operability of the 2001 BAE base vehicle, and, hence, the Custom Vehicle, within Oregon and the United States.

122. In reliance on GXV's fraudulent misrepresentations, LoRoad paid to GXV a good-faith deposit of $120,000, which GXV has still not returned. Due to GXV's refusal to return LoRoad's deposit, LoRoad was unable to fully pursue alternative custom vehicles in order to implement its planned business and marketing activities.

123. GXV's fraudulent misrepresentations and refusal to return LoRoad's deposit has caused LoRoad to suffer significant financial harm and prevented LoRoad from utilizing those funds to conduct its planned business and marketing activities.

COUNT II

(Negligent Misrepresentation – Base Vehicle)

124. LoRoad realleges and incorporates paragraphs 112 through 123.

SPH-2140463-1

125.    GXV, through its authorized representatives, Mike and Rene Van Pelt, falsely represented to LoRoad that the Custom Vehicle built on the 2001 BAE chassis identified in the proposed Assembly Agreement would be legal to register and operate on public roads in Oregon and throughout the United States.

126.    GXV possesses the requisite expertise as a manufacturer of custom expedition vehicles to discover, through reasonable diligence, that the 2001 BAE chassis was subject to geographical restrictions that prevented it from legally being resold for use in the United States.

127.    GXV possesses the requisite expertise to discover, through reasonable diligence, that the 2001 BAE chassis could not be legally operated on public roads in the United States.

128.    GXV failed to exercise reasonable care in determining whether or not the 2001 BAE chassis could legally be resold and driven on public roadways in the United States.

129.    GXV represented to LoRoad that the sale of the Custom Vehicle, built on the 2001 BAE chassis, would be legal and that the Custom Vehicle would be legal to operate on public roads in the United States.

130.    GXV made the above false representations in order to encourage LoRoad to enter into an agreement to pay GXV approximately $400,000 to $500,000 to build an expedition vehicle on the 2001 BAE chassis.

131.    LoRoad, as a consumer possessing no specialized knowledge or expertise in the field of custom vehicle manufacture, relied on the representations and expertise of GXV that the Custom Vehicle built on the 2001 BAE chassis would be legal to operate on public roads in Oregon and throughout the United States.

132.    In reliance on GXV's fraudulent misrepresentations, LoRoad paid to GXV a good-faith deposit of $120,000, which GXV has still not returned. Due to GXV's refusal to

return LoRoad's deposit, LoRoad was unable to fully pursue alternative custom vehicles in order to implement its planned business and marketing activities.

133.    GXV's fraudulent misrepresentations and refusal to return LoRoad's deposit has caused LoRoad to suffer significant financial harm and prevented LoRoad from utilizing those funds to conduct its planned business and marketing activities.

COUNT III

(Fraudulent Misrepresentation - Agreement)

134.    LoRoad realleges and incorporates paragraphs 124 through 133.

135.    As set forth above, Defendant GXV executed the November 15 version of the proposed Assembly Agreement and emailed a copy containing its authorized representative's signature to LoRoad on February 13, 2013.

136.    GXV thereafter asserted that there was a binding agreement between the parties memorialized by the November 15 Assembly Agreement it had executed. The November 15 version of the Assembly Agreement required arbitration of all disputes arising out of the agreement.

137.    Based upon GXV's continued representations regarding the existence of a contract (the Nov. 15 Assembly Agreement it had executed), LoRoad requested that the parties stipulate to arbitrate their dispute according to the terms of that Assembly Agreement.

138.    When GXV ignored LoRoad's request to stipulate to JAMS arbitration for over seven weeks, LoRoad was forced to file a petition to compel arbitration to attempt to reach a resolution based on the terms of the version of the Agreement that GXV had signed (the "Missouri Litigation").

139.   LoRoad sought an order compelling the parties to participate in arbitration pursuant to the terms of the November 15 version of the Assembly Agreement that GXV had executed.

140.   In response, GXV asserted for the first time that there was no agreement between the parties.

141.   GXV subsequently successfully argued before the district court and the Eighth Circuit Court of Appeals that there was no binding agreement between the parties and therefore the arbitration clause could not be enforced against GXV. Therefore, GXV's representations that the November 15 Executed Assembly Agreement was a binding agreement were false.

142.   GXV knew that it had represented to LoRoad that it had a binding agreement with LoRoad to build the Custom Vehicle; but GXV nevertheless pled to the district court and the Eighth Circuit Court of Appeals that no such agreement existed.

143.   GXV intended that LoRoad rely on its representation that an agreement was in place in order to induce LoRoad to incur legal expenses in attempting to enforce the arbitration provision of the November 15 Executed Assembly Agreement, while fully denying the existence of a contract.

144.   LoRoad was unaware that GXV would contend that there was no agreement in place between the parties until GXV moved to dismiss the Petition seeking to enforce the arbitration clause of the November 15 version of the Assembly Agreement that GXV executed.

145.   Had LoRoad been aware that GXV did not believe there actually was a binding agreement, LoRoad would not have incurred the expense of seeking to enforce the arbitration clause.

146.     LoRoad reasonably and rightfully relied on the representations of GXV in insisting that there was a contract between the parties and that the contract required arbitration of disputes.

147.     As a result of GXV's fraudulent misrepresentation, LoRoad has suffered and continues to suffer financial damage in the form of attorneys' fees and costs in an amount no less than $250,000 to date.

COUNT IV

(Negligent Misrepresentation – Agreement)

148.     LoRoad realleges and incorporates paragraphs 134 through 147.

149.     During the period of time in which GXV represented to LoRoad that it had a binding agreement between the parties, GXV knew or should have known, through reasonable diligence, that no agreement existed based on the absence of LoRoad's acceptance of the November 15 version of the Assembly Agreement and the parties' continued negotiation regarding material terms of the proposed agreement.

150.     GXV failed to exercise reasonable care in continuing to insist, after acknowledging that LoRoad did not accept the November 15 version of the proposed agreement and continuing to negotiate its terms, that it had a binding contract between it and LoRoad.

151.     LoRoad reasonably and rightfully relied on the representations of GXV in insisting that there was a contract between the parties and that the contract required arbitration of disputes.

152.     In addition to the loss of its deposit, GXV's failure caused LoRoad to incur significant additional expenses in attempting to resolve the matter and obtain a return of the deposit.

## COUNT V

### (Fraudulent Misrepresentation – Television Shows)

153.     LoRoad realleges and incorporates paragraphs 147 through 151.

154.     As set forth above, GXV represented to LoRoad that producers from the Travel Channel were interested in the Custom Vehicle build and in LoRoad. GXV represented to LoRoad that its Custom Vehicle could be featured on a television show that featured GXV builds.

155.     GXV thereafter represented to LoRoad that the television producers requested proof of LoRoad's commitment to having GXV built its Custom Vehicle in the form of a deposit.

156.     On information and belief, no television producer actually requested proof of LoRoad's commitment to purchase the Custom Vehicle in the form of a deposit.

157.     GXV knew that that no television producer had requested proof of LoRoad's commitment in the form of a deposit.

158.     GXV represented that a television producer requested proof of LoRoad's commitment in order to induce LoRoad to make a payment to GXV before the Assembly Agreement had been finalized.

159.     LoRoad had no way of knowing the falsity of GXV's representations regarding the television producer's request.

160.     Had LoRoad known that no television producer had requested proof of LoRoad's commitment, LoRoad would not have paid a deposit unless and until a final agreement could be reached.

SPH-2140463-1

161.    LoRoad reasonably and rightfully relied on GXV's representation regarding the television producer because GXV had repeatedly indicated that it was in contact with various producers from the Travel Channel. In reliance on GXV's representations, LoRoad in fact paid $120,000 to GXV via wire transfer from LoRoad's Oregon bank account on November 2, 2012.

162.    As a result of GXV's fraudulent misrepresentation, LoRoad has suffered and continues to suffer financial damages.

## COUNT VI

### (Unjust Enrichment)

163.    LoRoad realleges and incorporates paragraphs 153 through 162.

164.    GXV obtained $120,000 from LoRoad in the form of a deposit.

165.    GXV accepted the $120,000 from LoRoad as evidence by its confirmation of receipt of the funds.

166.    GXV has not returned the $120,000 it received from LoRoad despite demands for its return and despite the fact that there is no agreement between the parties otherwise.

167.    GXV's acceptance and its retention of the $120,000 from LoRoad is inequitable under the circumstances.

## COUNT VIII

### (Assumpsit - Money Had and Received)

168.    LoRoad realleges and incorporates paragraphs 163 through 167.

169.    GXV is indebted to LoRoad in the amount of $120,000 for money had and received by GXV.

170.    No part of the $120,000 has been returned to LoRoad, although LoRoad has demanded return of the $120,000 from GXV.

SPH-2140463-1

WHEREFORE, LoRoad prays for the following relief:

1.     For an award of damages in an amount of no less than $120,000 as a result of the good faith deposit money paid to GXV by LoRoad and which is presently held by GXV;

2.     For an award of damages in an amount to be determined for the loss of value of LoRoad's pickup and camper that was to account for a $70,000 credit on trade-in to GXV.

4.     For an award of damages in an amount of no less than $250,000 for attorneys' fees and costs incurred by LoRoad in Oregon and Missouri as a result of GXV's fraudulent misrepresentations regarding the existence of a contract between the parties, the BAE base vehicle, and the television shows;

5.     For an award of punitive damages against GXV in the amount of $1,200,000 for its fraudulent conduct reflected in Counts I, III, and V;

6.     For an award of pre- and post-judgment interest; and

7.     For such other relief as the court determines to be just and equitable;

LoRoad demands a jury trial as to each issue.

**HUSCH BLACKWELL LLP**

By /s/ *Bryan Wade*
_____
   Bryan O. Wade, MO Bar #41939
   Ginger K. Gooch, MO Bar #50302
   901 St. Louis Street
   Suite 1800
   Springfield, MO 65806
   Phone: 417.268.4000
   Fax: 417.268.4040
   Email:     byran.wade@huschblackwell.com
              ginger.gooch@huschblackwell.com

   Attorneys for Defendant LoRoad, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument was forwarded this 13th day of July, 2015, by electronic notification, to:

Andrew K. Bennett
CARNAHAN, EVANS, CANTWELL
& BROWN, P.C.
2805 S. Ingram Mill Road
P.O. Box 10009
Springfield, MO 65808-0009
Phone: (417) 447-4400
Fax: (417) 447-4401
Email: abennett@cecb.com

/s/*Bryan Wade*
Bryan O. Wade