# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

GLOBAL EXPEDITION VEHICLES, LLC, )
                                )
                Plaintiff, )
                                )
       v.                            ) Civil Action No. 6:15-cv-03296-MDH
                                )
                                )
LOROAD, LLC, and                    )
RODNEY LOUGH JR.,                )
                   Defendants. )

## SUGGESTIONS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

HUSCH BLACKWELL LLP


Bryan O. Wade        MO Bar #41939
Ginger K. Gooch      MO Bar #50302
901 St. Louis Street
Suite 1800
Springfield, MO 65806
Phone: 417.268.4000
Fax: 417.268.4040
Email:    bryan.wade@huschblackwell.com
             ginger.gooch@huschblackwell.com

Attorneys for Defendants LoRoad, LLC and
Rodney Lough, Jr.

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................3

Statement of Uncontroverted Material Facts .........................................................5

Argument ..............................................................................................................16

Standard of Review..............................................................................................16

    I.      DEFAMATION/SLANDER/LIBEL/INJURIOUS FALSEHOOD CLAIM.......17

        A.  Standard of Review.......................................................................17

        B.  LoRoad's Ability to Utilize and/or Drive the Custom Vehicle in the U.S. ...17

        C.  GXV/the Van Pelts are Liars and Thieves and Have Stolen $120,000 .........20

            1.  Rodney Made No Statement about "Thieves" .....................................20

            2.  Rodney's Statement that GXV and the Van Pelts Lied is True..........20

            3.  Rodney's Statement that GXV Has Stolen LoRoad's Money is True 21

        D.  GXV/Mike Van Pelt Have Worked Behind the Scenes and/or Placed Calls to Other Expedition Vehicle Manufacturers or Vendors to Prevent the Construction of Custom Expedition Vehicle for LoRoad............................22

        E.  GXV Has Not Suffered Any Actual Damages Caused by Allegedly Defamatory Statements Made by Rodney Lough Jr. .....................................24

        F.  GXV Does Not State a Claim for Punitive Damages ...................................25

    II.     BREACH OF NONDISCLOSURE AGREEMENT CLAIM ............................26

        A.  Standard of Review.......................................................................26

        B.  The Non-Disclosure Agreement Is Unenforceable Due to Lack of Consideration ................................................................................................27

        C.  No Proprietary Information Disclosed by GXV to Rodney..........................27

        D.  Rodney's Dealings with Matt DeWeerd and Crump Truck..........................29

1

     E.  Rodney Disclosed No Proprietary Information of GXV ..............................30

     F.  Any Alleged Proprietary Information is in the Public Domain ...................30

     G.  GXV Cannot Prove Damages as a Matter of Law .........................................31

III.    QUANTUM MERUIT .....................................................................................31

     A.  GXV Provided No Materials or Services at LoRoad's Request or

        Acquiescence ...............................................................................................32

     B.  GXV Never Made a Demand for Payment for Any Engineering or Design

        Work ...........................................................................................................33

IV.    RESTITUTION/UNJUST ENRICHMENT .......................................................33

     A.  LoRoad Received No Engineering or Design Work Product from GXV ......34

     B.  LoRoad Has Received No Specific Benefit From Anything GXV Allegedly

        Provided ......................................................................................................35

Conclusion .......................................................................................................35

# TABLE OF AUTHORITIES

Cases

*Anton v. St. Louis Suburban Newspapers, Inc.*, 498 S.W.2d 493 (Mo.App. 1980)....................22

*Bartulica v. Paculdo*, 411 F.Supp. 392 (W.D.Mo. 1976) ............................................................18

*Bose v. Consumer's Union of United States, Inc.*, 466 U.S. 485 (1984)....................................26

*Brown v. Briggs*, 569 S.W.2d 760 (Mo.App. 1978) ...................................................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................................17

*Deichmann v. Boeing Co.*, 36 F.Supp.2d 1166 (E.D.Mo. 1999)....................................26, 29, 31

*Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579 (Mo.banc 2013) ...........................................17

*Fowler v. Scott*, 164 S.W.3d 119 (Mo.App. 2005) ....................................................................32

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ....................................................................26

*Hoffmeister v. Kranawetter*, 407 S.W.3d 59 (Mo.App. 2013)....................................................34

*Jennings v.* SSM *Health Care St. Louis*, 355 S.W.3d 526 (Mo.App. 2011)................................34

*Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661 (Mo.banc 1988) .................................27

*Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809 (Mo.banc 2003) ..........................................24

*LoRoad, LLC v. Global Expedition Vehicles, LLC*, 787 F.3d 923 (8th Cir. 2015)...............13, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................16

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ..................................................................22

*Moritz v. Kansas City Star Co.*, 258 S.W.2d 583 (Mo.banc 1953)..............................................18

*Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo.banc 1993) ........................................17

*Nitsche v. CEO*, 446 F.3d 841 (8th Cir. 2006)...........................................................................16

*Pape v. Reither*, 918 S.W.2d 376 (Mo.App. 1996)....................................................................22

*Shafer v. Lamar Publ'g Co.*, 621 S.W.2d 709 (Mo.App. 1981) ..................................................26

3

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ............................................................................. 26

*Whitworth v. McBride & Son Homes, Inc.*, 344 S.W.3d 730 (Mo.App. 2011) ........................... 27

*Williams v. Pulitzer Broad. Co.*, 706 S.W.2d 508 (Mo.App. 1986) ............................................ 26

<u>Other Authorities</u>

Federal Rule of Civil Procedure 1 .............................................................................................. 17

Federal Rule of Civil Procedure 56(c) ....................................................................................... 16

MAI 3.05 ..................................................................................................................................... 26

MAI 3.06 ..................................................................................................................................... 26

MAI 23.06(1) .............................................................................................................................. 17

MAI 23.06(2) .............................................................................................................................. 17

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### I.       PARTIES AND BACKGROUND

1.      Global Expedition Vehicles, LLC ("GXV") is a manufacturer of custom expedition vehicles. Ex. 1 (GXV Petition ¶9).

2.      Mike Van Pelt ("Mike") is the sole owner of GXV. Ex. 2 (M. Van Pelt Depo. 7:23-25; 8:1-4).

3.      Rene Van Pelt ("Rene") is Mike Van Pelt's spouse and is an employee and representative of GXV. Ex. 2 (M. Van Pelt Depo. 9:22-25; 10:1-2; 77:11-18).

4.      Rodney Lough Jr. ("Rodney") is an American landscape photographer who specializes in photographing remote wilderness locations. Ex. 3 (R. Lough Depo. 12:1-2).

5.      LoRoad, LLC ("LoRoad") is the licensed distributor of Rodney's fine art photography to collectors around the world. Ex. 3 (R. Lough Depo. 114:10-24).

6.      While researching trucks and campers online, Rodney learned about specialized wilderness expedition vehicles equipped with living quarters capable of hauling sufficient food, water, and other supplies for weeks-long expeditions in any conditions. Ex. 4 (LoRoad's Counterclaims ¶¶11, 20-23).

7.      LoRoad decided to purchase a custom-built expedition vehicle so Rodney could continue and expand his wilderness photography portfolio throughout the United States and North America, and to use the vehicle for marketing purposes in promoting and selling Rodney's artwork. In addition, LoRoad intended to use the expedition vehicle for a television show featuring the vehicle taking Rodney into remote wilderness areas in the United States to capture photographs of amazing locations. Ex. 4 (LoRoad's Counterclaims ¶¶11-15); Ex. 3 (R. Lough Depo. 95:9-25; 96:1-25; 97:1-21); Ex. 2 (M. Van Pelt Depo. 56:24-25; 57:1-6).

8.      LoRoad researched manufacturers of expedition vehicles and learned that GXV appeared to have expertise and experience building expedition vehicles of the type LoRoad desired. Ex. 4 (LoRoad's Counterclaims ¶16).

9.      In September 2012, Rodney contacted GXV about building a finished custom expedition vehicle for LoRoad (the "Custom Vehicle") based on a Unimog brand model "U500" truck chassis. Ex. 5 (LoRoad 19); see also Ex. 4 (LoRoad's Counterclaims ¶¶22-23).

## II.     GXV REQUIRES RODNEY TO SIGN A NON-DISCLOSURE AGREEMENT

10.     Before continuing discussions, GXV required Rodney to sign a non-disclosure agreement (the "NDA"). Ex. 6 (LoRoad 6); Ex. 7 (NDA dated 9/6/12).

11.     GXV drafted the NDA without comment or revision by Rodney or anyone acting on his behalf. Ex. 8 (Lough Affidavit ¶6).

12.     The NDA does not recite any consideration on its face. Ex. 7 (NDA).

13.     No consideration, including money, was exchanged between GXV and Rodney at the time the NDA was signed.  Ex. 2 (M. Van Pelt Depo. 73:21-24).

14.     Attachment A to the NDA at A1.2 provides:  "When disclosed orally, Proprietary Information must be reduced to tangible form, marked as indicated above, and then received by the Recipient Party within 10 days after oral disclosure."  Ex. 7 (NDA A1.2).

15.     Attachment A provides an exception to the restriction on use and disclosure of "Proprietary Information" that "is in or comes into the public domain or the general knowledge of the RV/Expedition Camper/Vehicle industry otherwise than by a breach of this Agreement…" Ex. 7 (NDA A4.5).

16.     Rodney is not an engineer and has no engineering training. Ex. 8 (Lough Affidavit ¶8).

6

17.     Mike Van Pelt filed a provisional patent application on March 4, 2013 and April 29, 2013 and applied for a patent on what appears to be a cab height lifting roof expedition vehicle on March 4, 2014 and received a United States Patent on April 5, 2016. Ex. 9 (Van Pelt Patent).

18.     Matt DeWeerd invoiced Lough on 8/15/13 for "truck design/engineering" and on 1/28/14 for "truck design." Ex. 10 (DeWeerd invoices).

19.     Matt DeWeerd was formerly an employee of GXV; but he had already been terminated by GXV before he performed any work for LoRoad. Ex. 2 (M. Van Pelt Depo. 148:9-15).

20.     Rodney did not disclose any design or engineering documents to third party manufacturers from the time of Rodney's site visit at GXV's facilities in September 2012 until mid-January 2014, after receiving the work of Matt DeWeerd. Ex. 8 (Lough Affidavit ¶8).

21.     In its Initial Rule 26 disclosures, GXV disclosed no damages related to any alleged breach of the NDA. Ex. 11 (GXV Initial Rule 26 Disclosures C).

22.     In its First Supplemental Rule 26 disclosures served on the final day of discovery, GXV for the first time disclosed damages allegedly associated with the lost value of roof design but disclosed no documents on this issue. Ex. 12 (GXV First Supplemental Initial Rule 26 Disclosures C).

III.     **RODNEY VISITS GXV'S FACILITIES**

23.     In September 2012, Rodney traveled from his home in Oregon to visit GXV's facilities in Nixa, Missouri to discuss the proposed Custom Vehicle build. Ex. 13 (LoRoad 49); Ex. 8 (Lough Affidavit ¶7).

24.     In Paragraph 64 of its Petition, GXV alleges: "Through his visit and tour of GXV,

and exchange of information concerning the construction of the Custom Vehicle Mr. Lough acquired confidential and proprietary information of GXV that he would not have acquired otherwise." Ex. 1 (GXV Petition ¶64).

25.     At his deposition, Mike was asked to explain what proprietary confidential information he provided to Rodney. Mike testified Rodney visited the GXV facility and GXV "lifted our skirts up on everything. We had very much a whole long discussion, myself and my engineer." Ex. 2 (M. Van Pelt Depo. 72:15-16).

26.     Mike testified during the visit that they had extensive conversations about mounts, wall thicknesses, and other items. Ex. 2 (M. Van Pelt Depo. 72:14-73:16).

27.     Mike also testified GXV's breach of NDA claim was not based on any particular drawing or document provided by GXV to Rodney but on the information Rodney allegedly received during his visit to the GXV facility. Ex. 2 (M. Van Pelt Depo. 156:3-25).

28.     Mike could not recall if he provided Rodney blueprints during the site visit and he could not recall if Rodney took any notes during the visit. Ex. 2 (M. Van Pelt Depo. 157:23-158:8).

29.     In fact, Rodney did not receive any blueprints during the visit and he did not receive any other documents, except for a single page floor plan for a different model. Ex. 8 (Lough Affidavit ¶7); Ex. 43 (LoRoad 103).

30.     GXV has published this same floor plan on its website. Ex. 44 (GXV website).

31.     Rodney took no notes during his visit at the GXV facility. Ex. 8 (Lough Affidavit ¶7).

32.     Rodney took no photos during his visit at the GXV facility. Ex. 8 (Lough Affidavit ¶7).

8

33.     With respect to engineering and design work, the parties had agreed that LoRoad would not be obligated to pay for any such work until a final floor plan was approved. Ex. 45 (LoRoad 528, "Custom Floor Plan…Only changes to Floor Plan after approval of drawings will be billed at $75/hour…").

IV.     **THE BASE VEHICLE AT ISSUE**

34.     GXV informed LoRoad it preferred to wait until a contract was in place before it acquired a base vehicle but it understood that it was a cost of doing business to acquire an ideal base vehicle at a good price only to have a potential customer back out prior to entering into a contract. Exs. 14 and 15 (LoRoad 43; LoRoad 46).

35.     On September 29, 2012, GXV informed LoRoad it had located a BAE brand truck that could serve as the base vehicle for the proposed LoRoad build. Ex. 16 (LoRoad 82).

36.     GXV advertised its use of BAE vehicles for custom expedition vehicle builds. Ex. 2 (M. Van Pelt Depo. 135:1-19).

37.     The BAE truck which GXV recommended for LoRoad's custom expedition vehicle build was a 2001 model 6x6 with a Caterpillar engine (the "Caterpillar-equipped Base Vehicle"). Ex. 17 (LoRoad 85).

38.     GXV told LoRoad the "purchase price" of the Caterpillar-equipped Base Vehicle was "$110,000 USD." Exs. 17; 18 (LoRoad 85; LoRoad 98-102, 4(c)).

39.     The "Exhibit A – General Terms and Conditions" signed by Mike Van Pelt states that the Caterpillar-equipped Base Vehicle is for "Export Only," specifically "for export outside the U.S." Ex. 19 (Terms and Conditions Section 1(d)).

40.     The "Exhibit A – General Terms and Conditions" also states that the Caterpillar-equipped Base Vehicle is "not compliant with the Federal Motor Safety Standards and [has] not

9

been certified as compliant with the emission standards and requirements promulgated by the [EPA]…" and that the Caterpillar-equipped Base Vehicle "may not be used in any jurisdiction in which such operation would violate the law." Ex. 19 (Terms and Conditions 9(a)).

41.   GXV and the Van Pelts never disclosed to LoRoad or Rodney that Mike had personally purchased the Caterpillar-equipped Base Vehicle from BAE or that he had signed Terms and Conditions in connection with the sale which prohibited the use and resale of the vehicle in the United States. Ex. 2 (M. Van Pelt Depo. 53:6-24).

42.   Mike asked BAE for a Certificate of Origin or Manufacturer's Statement of Origin ("MSO") for the Caterpillar-equipped Base Vehicle that omitted the words "for export only" or anything to that effect. He made this request because state licensing agencies would not license a vehicle if there was any indication on documents submitted to the agency that the Caterpillar-equipped Base Vehicle was for export only. Ex. 20 (GXV 487-492); Ex. 2 (M. Van Pelt Depo. 38:4-25; 39:1-25; 40:1-3).

43.   GXV did not receive an MSO for the Caterpillar-equipped Base Vehicle before February 13, 2013, more than three months after Mike purchased the Caterpillar-equipped Base Vehicle from BAE. Ex. 2 (M. Van Pelt Depo. 65:5-21).

44.   Mike testified in deposition that he believes the Caterpillar-equipped Base Vehicle is legal to license and use in the United States because the MSO he claims GXV received from BAE contains no mention of an export-only restriction. Ex. 2 (M. Van Pelt Depo. 55:8-25; 56:1-10).

45.   BAE's corporate representative unequivocally testified at deposition in this case that the Caterpillar-equipped Base Vehicle, which GXV intended to sell to LoRoad, does not meet applicable federal emissions and safety standards and is NOT legal for domestic resale and

operation in the United States:

> Q.    So is it fair to say that the vehicle being sold by BAE under the terms of this contract to Mr. Van Pelt was for export only?
> A.    Yes sir.
> Q.    Is it fair to say that the vehicle being sold under this contract was not to be used in the continental United States?
> A.    Yes sir.
> Q.    And—is the reason for that the fact that it had this CAT engine that wasn't tested for certification or emissions certification?
> A.    Yes, the CAT engines do not have emissions.
> Q.    What—what did you—we didn't catch that.
> A.    They do not have emissions.  Those were not certified to have emissions testing.
> Q.    Should a certificate of origin [have] been issued for this vehicle?
> A.    No.
> Q.    And the—and the Caterpillar engine vehicle doesn't meet emissions standards for any of the states?
> A.    Yes, that's correct.

Ex. 21 (E. Guerrero Depo. 11:7-10; 11:18-25; 12:4-7; 12:15-17; 13:18-21).

46.    During the negotiations between LoRoad and GXV regarding the terms of the potential build agreement, LoRoad informed GXV it intended to register and title the Custom Vehicle in the State of Oregon. Rodney said "[I] just want to be sure that there are no issues [with title and registration in Oregon] as I cannot afford to purchase this and then not be able to drive it around." Exs. 22 and 23 (LoRoad 197; LoRoad 119).

47.    GXV responded "Yes" and assured LoRoad that the Custom Vehicle would be sold to LoRoad on a "Motor Vehicle Bill of Sale" and that LoRoad could license it in whatever state it would choose. Exs. 24 and 25 (LoRoad 210 (beginning at "Almost…"; LoRoad 216).

## V.    RODNEY WIRES $120,000 TO GXV; GXV ASSERTS THERE IS A CONTRACT

48.    In late October, while Rodney was out in the field on a photo expedition, Rene and Rodney exchanged text messages regarding television producers' interest in featuring LoRoad's custom vehicle build project. Ex. 26 (GXV 387-392).

49.     On October 31, 2012, GXV emailed Rodney another revised version of the contract documents. Ex. 27 (LoRoad 257).

50.     On November 2, 2012, after Rodney returned home from the photo expedition, LoRoad wired $120,000 to GXV. Ex. 28 (LoRoad 268).

51.     By November 30, 2012, the parties had not reached agreement on the proposed contract documents. Ex. 29 (LoRoad 299).

52.     In December 2012, GXV and LoRoad continued back and forth discussions regarding the proposed contract documents. Ex. 30 (LoRoad 307-311).

53.     On February 11, 2013, LoRoad asked GXV to send a final set of proposed contract documents incorporating all the discussions to date for review. In response, GXV asserted it already had a contract which it said was signed by LeeAnna Lough, an authorized representative of LoRoad, on November 15, 2012. Exs. 31; 42 (LoRoad 455-457; LoRoad 481-482).

54.     GXV emailed LoRoad five pages (out of a total of fourteen (14) pages faxed by Rodney to GXV) consisting only of the marked up Assembly Agreement portion that Rodney had faxed to GXV on or about November 16, 2012. The pages sent by GXV to LoRoad contained Mike Van Pelt's signature on behalf of GXV. Ex. 32 (LoRoad 463-471).

55.     Mike testified at his deposition that he signed the document on or about February 11, 2013, shortly before GXV emailed it to LoRoad in response to Rodney's request for a copy of what GXV claimed was a signed contract. Ex. 2 (M. Van Pelt Depo. 103:13-21).

56.     On February 25, 2013, Rodney emailed GXV identifying reasons LoRoad did not believe it had entered into an agreement with GXV. Ex. 33 (LoRoad 538).

57.     Mike authored a post on expeditionportal.com stating:   "We have always

maintained there was and is a contract." Ex. 34 (GXV 332).

58.　　GXV did not return, and to this day has not returned, all or any portion of the $120,000.00 which LoRoad paid to GXV on November 2, 2012. Ex. 2 (M. Van Pelt Depo. 176:4-12).

## VI.　　GXV ARGUES IN COURT THE PARTIES HAVE NO CONTRACT

59.　　On June 18, 2013, LoRoad filed a Petition to Compel Arbitration in the United States District Court for the Western District of Missouri. LoRoad sought to compel arbitration under the terms of the contract which GXV insisted it had with LoRoad. Ex. 35 (LoRoad Petition to Compel Arbitration).

60.　　GXV moved to dismiss LoRoad's petition and its motion was denied. Ex. 36 (GXV Motion to Dismiss).

61.　　GXV then filed a motion for summary judgment, arguing that LoRoad had not accepted the proposed contract documents and therefore could not seek to enforce the binding arbitration clause because the parties had no agreement. Ex. 37 (GXV Motion for Summary Judgment).

62.　　The district court granted summary judgment in favor of GXV. Ex. 38 (Order Granting GXV Motion for Summary Judgment).

63.　　LoRoad appealed the district court's decision to the United States Court of Appeals for the Eighth Circuit. *See LoRoad, LLC v. Global Expedition Vehicles, LLC*, 787 F.3d 923, 927-28 (8th Cir. 2015).

64.　　The Eighth Circuit held there was never a contract between LoRoad and GXV because LoRoad did not manifest acceptance of GXV's proposed contract documents. *Id.*

65.　　The court specifically cited a February 25, 2013 email from Rodney to GXV in

13

which Rodney explained there was no way LeeAnna Lough could have signed those documents on behalf of LoRoad and that LoRoad would never have agreed to the documents at that time because there were material terms not yet agreed upon. *Id.* at 928.

66.     Almost immediately after the Eighth Circuit issued its Opinion, GXV filed the present lawsuit asserting claims of Quantum Meruit, Restitution/Unjust Enrichment, Breach of Non-Disclosure Agreement, and Defamation/Slander/Libel/Injurious Falsehood. Ex. 1 (GXV Petition).

## VII.   ALLEGED DEFAMATION ON EXPEDITIONPORTAL.COM BY RODNEY

67.     GXV alleges Rodney made three specific statements upon which it bases its defamation claim. Ex. 1 (GXV Petition ¶¶73-75).

68.     GXV alleges Rodney made each statement "on the online forum expeditionportal.com." Ex. 1 (GXV Petition ¶72).

69.     Mike also made postings on expeditionportal.com, including the post that "We have always maintained there was and is a contract." Ex. 34 (GXV 332).

70.     GXV is unable to identify any instance wherein it had to turn away a customer because of anything Rodney said or did, and it is unable to produce proof of a single customer who planned to purchase from GXV and then declined to do so based on any posting by Rodney on expeditionportal.com. Ex. 2 (M. Van Pelt Depo, pp. 139:20-25; 140:13-25; 141:1-25; 142:1-14; 151:16-25; 152:1-10).

71.     GXV was unable to identify a single vendor or supplier who stopped doing business with GXV based on any posting by Rodney on expeditionportal.com. Ex. 2 (M. Van Pelt Depo. 163:18-25: 164:1-17).

72.     Mike testified GXV decided not to do business with another vendor, Pecocar,

14

because Mike was unhappy Pecocar had talked to Rodney about working on a replacement custom vehicle. Ex. 2 (M. Van Pelt Depo. 163:18-25: 164:1-17).

## VIII.  RODNEY'S EFFORTS TO SECURE A REPLACEMENT CUSTOM VEHICLE

73.     LoRoad purchased a Cummins-engine equipped truck (the "Cummins-equipped Base Vehicle") directly from BAE for $80,000.00. Ex. 3 (R. Lough Depo. 120:6-20).

74.     In the process of trying to have a replacement custom expedition vehicle built, LoRoad contacted a company called Pecocar, which manufactures lightweight wall panels for campers. After several weeks of discussions, Pecocar abruptly withdrew and stated it would not be able to do anything for LoRoad. Ex. 40 (GXV 317-318).

75.     Mike has testified that GXV stopped doing business with Pecocar because Mike was unhappy that Pecocar had talked to Rodney and LoRoad. Ex. 2 (M. Van Pelt Depo. 163:18-25: 164:1-17).

76.     LoRoad contacted Crump Truck in Springfield, Missouri to inquire about installing a subframe on its Cummins-equipped Base Vehicle upon which a box containing living quarters could eventually be mounted. Ex. 3 (R. Lough Depo. 86:18-25; 87:1-3).

77.     Shortly thereafter, Crump Truck informed LoRoad that Rene Van Pelt and Mike Van Pelt had each contacted Crump Truck and asked Crump Truck not to do any work for LoRoad. Ex. 41.

78.     Mike acknowledged there was nothing inappropriate about Rodney hiring Crump Truck but complained Rodney should not have broadcast that he hired Crump Truck on the expeditionportal.com website. Ex. 2 (M. Van Pelt Depo. 154:5-19).

79.     Mike could not recall if there is a nondisclosure agreement between Crump Truck and GXV. Ex. 2 (M. Van Pelt Depo. 155:6-7).

15

80.     At his deposition, Mike admitted that he had in fact contacted the owner of Crump Truck, Darrin Barnes, to say that he did not want Crump Truck to do any work for LoRoad. He also admitted that Rene Van Pelt had said the same thing to a different employee of Crump Truck. Ex. 2 (M. Van Pelt Depo. 166:21-25; 167:1-12).

81.     At his deposition, Mike explained Rodney hired an individual who had been previously fired by GXV, Matt DeWeerd, and that Rodney provided DeWeerd with information from GXV and "they collaborated into a design that they provided to Bliss Manufacturing." Ex. 2 (M. Van Pelt Depo. 147:12-149:2).

82.     Mike testified DeWeerd was subject to a nondisclosure and a noncompete agreement with GXV, but that GXV has taken no legal action against DeWeerd. Ex. 2 (M. Van Pelt Depo. 149:3-5).

## ARGUMENT

### Standard of Review

"Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nitsche v. CEO*, 446 F.3d 841, 845 (8th Cir. 2006). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). After the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. *Id.*

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## I.  DEFAMATION/SLANDER/LIBEL/INJURIOUS FALSEHOOD CLAIM
### (GXV Count IV) (mislabeled Count III)

GXV alleges Rodney made three specific statements upon which it bases its defamation claim. Ex. 1 (GXV Petition ¶¶73-75).  GXV alleges Rodney made each statement "on the online forum expeditionportal.com." Ex. 1 (GXV Petition ¶72).

### A.    Standard of Review

Under Missouri law, to state a claim for defamation, a plaintiff must allege 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 5) that damages the plaintiff's reputation. *Farrow v. St. Francis Med. Ctr.*, 407 S.W.3d 579, 598-99 (Mo.banc 2013); MAI 23.06(1), (2).

In a libel case, a "plaintiff must make her allegations *in haec verba*, or in the exact words alleged to be defamatory."  *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 313 (Mo.banc 1993).

### B.    LoRoad's ability to utilize and/or drive the Custom Vehicle in the U.S.

GXV alleges "[Rodney] has stated that GXV lied about LoRoad's ability to utilize and/or drive the Custom Vehicle in the United States." Ex. 1 (GXV Petition ¶75). GXV's claim fails as a matter of law because GXV is unable to show that Rodney ever said "GXV lied about LoRoad's ability to utilize and/or drive the Custom Vehicle in the United States" because Rodney never published these words.

In answering a question from another forum member, Rodney did state LoRoad

17

"discovered after the fact" that the truck GXV intended to sell to LoRoad is NOT legal to operate in the United States. Rodney then stated that GXV "never disclosed this information." Neither statement is defamatory as a matter of law because both statements are true. GXV does not dispute that it never disclosed this information to Rodney. Ex. 2 (M. Van Pelt Depo. 53:6-24). The BAE corporate representative has testified that the vehicle is for export only and it does not meet United States emissions regulations. Ex. 21 (E. Guerrero Depo. 11:7-10; 11:18-25; 12:4-7; 12:15-17; 13:18-21). Truth is an absolute defense to a claim of defamation under common law. *Moritz v. Kansas City Star Co.*, 258 S.W.2d 583, 585 (Mo.banc 1953); *Bartulica v. Paculdo*, 411 F.Supp. 392, 397 (W.D.Mo. 1976). Further, statements that are substantially true, even if some aspect of the statement is false, do not support a claim for defamation. *Brown v. Briggs*, 569 S.W.2d 760, 762 (Mo.App. 1978).

GXV apparently now claims that the Caterpillar-equipped Base Vehicle may be operated legally in the United States because the Vehicle's Certificate of Origin or Manufacturer's Statement of Origin ("MSO") contains no "export only" language. Ex. 2 (M. Van Pelt Depo. 55:8-25; 56:1-10). This position is directly contrary to the position of BAE, the vehicle manufacturer, that the Caterpillar-equipped Base Vehicle is for export only because it is not United States emissions compliant and that no MSO should have been issued for the Caterpillar-equipped Base Vehicle. Ex. 21 (E. Guerrero Depo. 11:7-10; 11:18-25; 12:4-7; 12:15-17; 13:18-21). Further, Mike and GXV did not receive the MSO upon which GXV claims to rely until several months after Mike had purchased the Caterpillar-equipped Base Vehicle and signed the Terms and Conditions specifying "export only" and further specifying that the Caterpillar-equipped Base Vehicle does not comply with Federal Motor Vehicle Safety Standards or United States emissions requirements. Ex. 2 (M. Van Pelt Depo. 65:5-21). Further, Mike has

acknowledged that the MSO for the Caterpillar-equipped Base Vehicle does not contain any language prohibiting domestic resale or use of the Vehicle because he specifically told his contact at BAE to omit the words "export only" from the MSO. Ex. 20 (GXV 487-492). Mike also admitted that if the MSO contained the words "export only," he probably would not be able to get any DMV to register the vehicle domestically. Ex. 2 (M. Van Pelt Depo. 38:4-25; 39:1-25; 40:1-3). Even assuming GXV's argument about the effect of the MSO language is correct, which Rodney disputes based on the clear testimony of the BAE representative, GXV has no evidence showing that Rodney had any knowledge of the MSO which GXV received more than three months after it purchased the Caterpillar-equipped Base Vehicle from BAE.

The undisputed evidence shows Rodney specifically asked GXV whether the Custom Vehicle could be *legally* registered and operated in the United States. He requested that GXV confirm he "wouldn't have any issues getting title transfer and registration done here in Oregon" because LoRoad "[couldn't] afford to purchase this and then not be able to drive it around." GXV's response was an unequivocal "Yes…" Ex. 24 (LoRoad 210). Of note, although Rene Van Pelt offered some additional information in GXV's response to Rodney's request, nothing in her response negated her affirmative "Yes" or even hinted of potential legal issues relating to registration and use of the Custom Vehicle in the United States. Rodney's question was clear, and GXV's response was unequivocal. GXV clearly intended to reassure Rodney and cause him to believe there were absolutely no actual or potential questions regarding the legality of LoRoad registering and operating the Custom Vehicle in the United States. Given BAE's unequivocal testimony that the Caterpillar-equipped Base Vehicle is for export only and does not satisfy United States emissions standards, Rodney reasonably believed and believes that the Custom Vehicle which GXV intended to build for LoRoad using the Caterpillar-equipped Base Vehicle

19

may not be operated legally in the United States and that GXV failed to disclose this information to him, precluding a defamation claim as a matter of law. Rodney's statement that the Caterpillar-equipped Base Vehicle is not legal and his statement that GXV failed to disclose this are substantially true. Accordingly, Rodney respectfully requests summary judgment be granted in his favor on GXV's claim for defamation regarding any statements relating to Paragraph 75 of GXV's Petition.

## C.    GXV/the Van Pelts are Liars and Thieves and Have Stolen $120,000

GXV alleges that Rodney has stated that "GXV/the Van Pelts are liars and thieves, and that they have stolen one hundred and twenty thousand dollars ($120,000.00) from him." Ex. 1 (GXV Petition, ¶73).

### 1.    Rodney Made No Statement about "Thieves"

Although GXV alleges that Rodney has stated that GXV/the Van Pelts are "thieves," GXV has not produced any evidence to support this allegation. Nowhere in the documentation from expeditionportal.com does Rodney use the word "thieves." Accordingly, summary judgment should be granted with respect to GXV's defamation claim relating to this particular allegation.

### 2.    Rodney's Statement that GXV and the Van Pelts lied is true

GXV alleges that Rodney stated that GXV/the Van Pelts are liars. The statements upon which GXV based this allegation were made by Rodney in response to a forum post by Mike Van Pelt in which Mike stated: "We have always maintained there was and is a contract." Ex. 34 (GXV 332). It should be noted at the outset that Mike's statement itself is reasonably interpreted as calling LoRoad/Rodney liars based on the context in which it was made. Mike posted in a thread in which Rodney had provided links for forum members to the publicly available court

records relating to the ongoing legal actions between GXV and LoRoad. The assertion that GXV had altered its prior position from insisting it had a binding contract to subsequently arguing the absence of a binding contract had been made by LoRoad in its pleadings. Mike's statement on the forum therefore essentially called LoRoad and Rodney liars for what LoRoad had asserted in the litigation. Mike's statement is demonstrably false based on the uncontroverted evidence.

First, GXV had insisted it had a binding contract with LoRoad in February 2013. Exs. 31; 42 (LoRoad 457; LoRoad 481-482). After LoRoad filed a petition to enforce the arbitration clause found in the contract that GXV insisted was binding, GXV filed a motion to dismiss the petition and was denied. Then, just as GXV was about to be forced into arbitration, GXV switched its position and argued for the first time in a motion for summary judgment that LoRoad had not accepted the proposed contract (which is exactly what LoRoad had demonstrated to GXV multiple times previously to no avail). Ex. 37 (GXV Motion for Summary Judgment). Accordingly, Mike's statement that GXV/the Van Pelts "always maintained there was and is a contract" is demonstrably false. GXV had in fact successfully argued the opposite position resulting in a finding by the Eighth Circuit Court of Appeals that there was never an agreement between the parties. Rodney's statement calling Mike's false assertion a lie is accurate. At the least, it was perfectly reasonable for Rodney to conclude, based on the circumstances, that GXV had in fact changed its position and that Mike's assertion was untrue. Accordingly, the uncontroverted evidence shows that Rodney's statement is substantially true and is therefore not actionable as a matter of law.

### 3. Rodney's statement that GXV has stolen LoRoad's money is true

GXV fails to state a claim for defamation as a matter of law because it must state the exact words claimed to be defamatory and it is unable to show that Rodney said GXV has

"stolen one hundred and twenty thousand dollars ($120,000) from him." In fact, GXV does not dispute that LoRoad wired $120,000.00 to GXV and that GXV had not, as of the date of Rodney's comment, and still today, returned all or any part of this money to LoRoad. At the time Rodney's statement above was made, LoRoad had already purchased an alternate vehicle for $80,000.00 and had to incur significant legal expenses to retain the services of an attorney due to GXV's refusal to return LoRoad's money. LoRoad was deprived of the use of a substantial amount of money in excess of $200,000.00 in total, which Rodney reasonably believed and believes resulted from GXV's conduct. Therefore, even if GXV had properly pleaded this claim, which it has not, any statement by Rodney to this effect is substantially true as a matter of law.

With respect to a characterization by Rodney that GXV had "stolen" money, this is a classic example of assertions of "fraudulent or illegal conduct…[which] are conclusions about the consequences that should attach to certain conduct, and as such they too are opinions." A plaintiff may not recover for defamatory statements that consist of nothing more than opinions. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 20-21 (1990). *See also Anton v. St. Louis Suburban Newspapers, Inc*., 598 S.W.2d 493, 498 (Mo.App. 1980). Furthermore, "allegations of fraudulent or illegal conduct are conclusions about the consequences that should attach to certain conduct, and as such they too are opinions." *Pape v. Reither*, 918 SW 2d 376, 381 (Mo.App. 1996). This characterization of LoRoad's money as being "stolen" is clearly a predictive opinion of how Rodney thought the matter should eventually turn out in court.

**D.     GXV/Mike Van Pelt Have Worked Behind the Scenes and/or Placed Calls to Other Custom Expedition Vehicle Manufacturers to Prevent the Construction of Custom Expedition Vehicle for LoRoad**

GXV also alleges Rodney "stated that GXV/the Van Pelts have worked behind the scenes

and/or placed calls to other custom expedition vehicle manufacturers to prevent the construction of custom expedition vehicle for LoRoad." Ex. 1 (GXV Petition ¶74).

After the proposed deal with GXV fell through, LoRoad sought to mitigate its damages by attempting to move forward in getting an expedition vehicle built using a (legal) Cummins-equipped Base Vehicle which LoRoad purchased directly from BAE. Crump Truck in Springfield, Missouri was one of the vendors LoRoad sought assistance from to perform some of the work on the alternate truck. During Rodney's discussions with one of the Crump Truck representatives, the representative informed Rodney that Crump had been contacted by GXV and asked not to do any work for LoRoad. Ex. 41. Not long afterward, a component manufacturing company by the name of Pecocar suddenly withdrew from weeks of discussions with LoRoad regarding manufacturing panels for LoRoad's alternative truck build project. See Ex. 40 (GXV 317-318). At the time, Pecocar was the supplier of panels for GXV as well as other expedition vehicle manufacturers worldwide. The timing of Pecocar's sudden withdrawal was suspicious to say the least, especially given that LoRoad had learned that GXV had contacted Crump Truck and asked them not to do any work for LoRoad.

In his deposition, Mike admitted that he had, in fact, contacted Crump Truck and asked them not to do any work for LoRoad. He also admitted that Rene Van Pelt had contacted Crump Truck for the same reason. Ex. 2 (M. Van Pelt Depo. 154:5-19). Mike's admission that he and his wife contacted Crump Truck and asked them not to work for Rodney or LoRoad negates GXV's claim of defamation based on the allegations set forth in Paragraph 74 of GXV's Petition as truth is an absolute defense to defamation. Rodney is entitled to summary judgment as a matter of law on this claim.

**E.     GXV Has Not Suffered Any Actual Damages Caused by Allegedly Defamatory Statements Made by Rodney Lough Jr.**

Even assuming GXV had stated an actionable claim for defamation concerning any alleged defamatory statement, GXV's claims of defamation fail because GXV cannot prove damages.  A defamation plaintiff generally may only recover actual damages which are causally related to the defamatory publication. *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 815-16 (Mo.banc 2003). There are no presumed damages absent a showing of actual malice. *Id.* Here, there is no evidence of actual malice on the part of Rodney. Actual damages also requires specific proof of the harm. *Id.* Under Missouri law, emotional distress alone is not sufficient to recover damages. *Id.* The plaintiff must present specific proof of impairment to reputation in order to recover any damages for defamation. *Id.*

GXV has not produced any specific proof of actual damages as a result of any allegedly defamatory statements it claims Rodney made. Mike Van Pelt testified at deposition on his own behalf and as the designated corporate representative of GXV. Ex. 2 (M. Van Pelt Depo. 12:1-11). When asked how GXV/the Van Pelts claim to have been damaged by any allegedly defamatory statement made by Rodney, Mike initially claimed GXV lost multiple customers who had been planning to purchase from GXV but backed out due to statements made by Rodney on expeditionportal.com. Then, when pressed to specifically identify an example in which this occurred, Mike could recall only one such instance. But he completely undermined GXV's claim for damages in this regard by admitting he had no proof the customer actually declined to purchase something from GXV as a result of anything Rodney posted on expeditionportal.com. Ex. 2 (M. Van Pelt Depo. 139:20-25; 140:13-25; 141:1-25; 142:1-14).

It should be noted that Mike also claimed at one point that GXV lost a vendor/supplier as

a result of Rodney's statements on expeditionportal.com. But once again when Mike was pressed for details, he revealed that he was the one who actually severed the relationship with the vendor/supplier. Ex. 2 (M. Van Pelt Depo. 163:18-25: 164:1-17). He revealed that the name of the vendor/supplier was Pecocar. This is the same Pecocar that suddenly cut off communication with LoRoad after several weeks of discussions with LoRoad regarding purchasing panels from Pecocar. Mike admitted he told Pecocar that GXV would not purchase from them anymore because Mike did not like that Pecocar talked to LoRoad. *Id.*

Despite filing this lawsuit over one year ago, GXV has failed to produce a single document or other piece of specific evidence to prove it suffered any damages relating to its defamation claims. Accordingly, to the extent any of GXV's defamation claims survive summary judgment concerning all other elements of this cause of action, Rodney respectfully requests that summary judgment be granted on the basis that there is no genuine issue of material fact on the damages element of GXV's claim.

**F.      GXV Does Not State a Claim for Punitive Damages**

GXV requests punitive damages only in relation to its claim of defamation against Rodney personally. Ex. 1 (GXV Petition, Prayer for Relief under Count IV (erroneously labeled as Count III)). As set forth above, LoRoad and Rodney submit that the uncontroverted evidence supports granting summary judgment in Rodney's favor on GXV's defamation claim entirely, which therefore extinguishes GXV's request for punitive damages. Even if any part of GXV's claim of defamation survives summary judgment, the uncontroverted evidence does not support an instruction for punitive damages against Rodney as a matter of law.

GXV has not produced any evidence of actual malice on the part of Rodney in connection with any of Rodney's statements on expeditionportal.com. There is no evidence that

Rodney had actual knowledge that any allegedly defamatory statements were false. On the contrary, the evidence shows that any statements made by Rodney were true. There is no evidence that Rodney subjectively possessed serious doubts as to the veracity of any of his statements. Insinuations, suggestions, accusations by GXV and/or the Van Pelts and arguments by their counsel are not evidence of actual malice on Rodney's part. A person cannot recover punitive damages for defamation absent proof of actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). To prove actual malice, the plaintiff must prove that the defendant had either actual knowledge of falsity or subjectively entertained serious doubts about the truth of the statement at the time it was made. *St. Amant v. Thompson*, 390 U.S. 727, 73l (1968). *See also Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485, 511 n.30 (1984). Even recklessly publishing a false statement or recklessly failing to investigate the truth of the matter does not constitute actual malice. *Williams v. Pulitzer Broad. Co.*, 706 S.W.2d 508, 512 (Mo.App. 1986); *see also Shafer v. Lamar Publ'g Co*., 621 S.W.2d 709, 714 (Mo.App. 1981). The standard of proof required under Missouri law to prove actual malice is "clear and convincing" evidence. *Williams*, 706 S.W.2d at 512; MAI 3.05, 3.06. There is no "clear and convincing" evidence to even suggest Rodney possessed actual knowledge of falsity or serious doubts of veracity regarding any statements alleged by GXV.

## II.     BREACH OF NONDISCLOSURE AGREEMENT CLAIM
### (GXV Count III)

**A.**    **Standard of Review**

"In a contract case, summary judgment is appropriate where, as here, the language of the contract is clear and unambiguous and the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document." *Deichmann v. Boeing Co.*, 36 F.Supp.2d 1166, 1170 (E.D.Mo. 1999) (granting summary judgment for

defendant on plaintiff's breach of non-disclosure agreement claim).

Summary judgment in favor of Rodney is appropriate because GXV has not identified any confidential and proprietary information disclosed to Rodney by GXV and because GXV has not identified any confidential, proprietary information of GXV disclosed by Rodney to third parties.

**B.      The Non-Disclosure Agreement Is Unenforceable Due to Lack of Consideration**

The elements required to form a valid contract in Missouri are 'offer, acceptance, and bargained for consideration.'" *Whitworth v. McBride & Son Homes, Inc.*, 344 S.W.3d 730, 737 (Mo.App. 2011) (quoting *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo.banc 1988)). The NDA between GXV and Rodney is unenforceable because it lacks consideration. The NDA does not recite any consideration on its face. Ex. 7 (NDA). Mike Van Pelt testified no consideration, including money, was exchanged between GXV and Rodney at the time the NDA was signed. Ex. 2 (M. Van Pelt Depo. 73:21-24). For the reasons set out below, to the extent GXV is arguing the mutual promises of the parties constitute sufficient consideration to support the NDA, that argument is unavailing since there is no evidence GXV disclosed any proprietary, confidential information to Rodney under the express terms of the NDA.

**C.      No Proprietary Information Disclosed by GXV to Rodney**

In Paragraph 64 of its Petition, GXV alleges: "Through his visit and tour of GXV, and exchange of information concerning the construction of the Custom Vehicle Mr. Lough acquired confidential and proprietary information of GXV that he would not have acquired otherwise." Ex. 1 (GXV Petition ¶64). At his deposition, Mike was asked to explain what proprietary confidential information he provided to Rodney. Mike testified Rodney visited the GXV facility and GXV "lifted our skirts up on everything.  We had very much a whole long discussion,

myself and my engineer." Ex. 2 (M. Van Pelt Depo. 72:15-16). Mike testified during the visit that they had extensive conversations about mounts, wall thicknesses, and other items. Ex. 2 (M. Van Pelt Depo. 72:14-73:16). Mike also testified GXV's NDA claim was not based on any particular drawing or document provided by GXV to Rodney but on the information Rodney received during his visit to the GXV facility. Ex. 2 (M. Van Pelt Depo. 156:3-25). Mike could not recall if he provided Rodney blueprints during the site visit and he could not recall if Rodney took any notes during the visit. Ex. 2 (M. Van Pelt Depo. 157:23-158:8). In fact, Rodney did not receive any blueprints during the visit and he took no notes. Ex. 8 (Lough Affidavit ¶7). Rodney took no photos during his visit at the GXV facility. Ex. 8 (Lough Affidavit ¶7). Rodney is not an engineer and has no engineering training. Ex. 8 (Lough Affidavit ¶8).

Even assuming for purposes of summary judgment only that Mike, on behalf of GXV, believes he provided confidential, proprietary information of GXV to Rodney during Rodney's site visit in September 2012, GXV fails to state a claim for breach of the NDA under the express terms of the NDA because Attachment A to the NDA at A1.2 provides: "When disclosed orally, Proprietary Information must be reduced to tangible form, marked as indicated above, and then received by the Recipient Party within 10 days after oral disclosure." Ex. 7 (NDA A1.2). GXV drafted the NDA without comment or revision by Rodney or anyone acting on his behalf. Ex. 8 (Lough Affidavit ¶6).

GXV has adduced no evidence that it reduced any alleged Proprietary Information to a tangible form, marked the information proprietary, and provided it to Rodney within 10 days after oral disclosure. Because GXV did not follow the requirements of the NDA concerning oral disclosure of alleged proprietary information, Rodney had no way of knowing any allegedly proprietary information disclosed to him during his site visit was confidential and subject to the

NDA. GXV fails to state a claim for breach of the NDA as a matter of law. *See Deichmann*, 36 F.Supp.2d at 1170 (Defendant entitled to summary judgment on Plaintiffs' breach of NDA claim where NDA, drafted by Plaintiffs, excludes from coverage information which at the time of disclosure or thereafter becomes public knowledge.) The same analysis applies here. GXV drafted the NDA and explicitly set forth how oral disclosures of alleged proprietary information should be handled. Mike has testified GXV is relying on oral disclosures made to Rodney during his site visit to state a claim for breach of the NDA, but GXV is unable to establish as a matter of law that it complied with the NDA it drafted concerning oral disclosures of confidential information and therefore has no breach of contract claim against Rodney as a matter of law.

**D.      Rodney's Dealings with Matt DeWeerd and Crump Truck**

In its Petition, GXV alleges "LoRoad has utilized the engineering and design work performed by GXV and provided to LoRoad in the design of its new custom expedition vehicle" and that "LoRoad utilized the same company that GXV used for modifications of the Custom Vehicle, which is located in Springfield, Missouri, for modifications of LoRoad's new vehicle." Ex. 1 (GXV Petition ¶¶66-67). At his deposition, Mike explained Rodney hired an individual who had been fired by GXV, Matt DeWeerd, and that Rodney provided DeWeerd with information from GXV and "they collaborated into a design that they provided to Bliss Manufacturing." Ex. 2 (M. Van Pelt Depo. 147:12-149:2). Mike testified DeWeerd was subject to a nondisclosure and a noncompete agreement with GXV, but that GXV has taken no legal action against DeWeerd. Ex. 2 (M. Van Pelt Depo. 149:3-5). GXV has failed to establish as a matter of law how Rodney's hiring of a former GXV employee in itself violates the NDA.

As to Rodney hiring Crump Truck to work on his replacement expedition vehicle, Mike acknowledged there was nothing inappropriate about Rodney hiring Crump Truck but

complained Rodney should not have broadcast that he hired Crump Truck on the expeditionportal.com website. Ex. 2 (M. Van Pelt Depo. 154:5-19). Mike could not recall if there is a nondisclosure agreement between Crump Truck and GXV. Ex. 2 (M. Van Pelt Depo. 155:6-7).

**E.  Rodney Disclosed No Proprietary Information of GXV**

Because GXV cannot establish it disclosed any proprietary information to Rodney under the plain language of the NDA it drafted, GXV likewise cannot establish that Rodney disclosed any proprietary information of GXV to any third party in breach of the NDA.

The record evidence reflects that terminated GXV employee Matt DeWeerd invoiced Lough on 8/15/13 for "truck design/engineering" and on 1/28/14 for "truck design." Ex. 10 (DeWeerd invoices). The record evidence reflects that Rodney did not disclose any design or engineering information to third party manufacturers from the time of Rodney's site visit at GXV's facilities in September 2012 until he began contacting manufacturers in mid-January 2014, after receiving the work he contracted for from Matt DeWeerd. Ex. 8 (Lough Affidavit ¶8). If GXV believes DeWeerd supplied proprietary information of GXV to Rodney in violation of the non-compete and nondisclosure agreements between GXV and DeWeerd, that issue is between GXV and DeWeerd. GXV simply has not established any improper disclosure of proprietary information by Rodney as a matter of law.

**F.  Any Alleged Proprietary Information is in the Public Domain**

Any alleged disclosure of proprietary information by Rodney to vehicle manufacturers is not actionable under the plain language of the NDA because, under A4.5 of the NDA drafted by GXV, there is no restriction on use or disclosure of Proprietary Information that "is in or comes into the public domain or the general knowledge of the RV/Expedition Camper/Vehicle industry

otherwise than by a breach of the Agreement." The record evidence is that Mike Van Pelt filed a provisional patent application on March 4, 2013 and April 29, 2013 and applied for a patent on what appears to be a cab height lifting roof expedition vehicle on March 4, 2014 and received a United States Patent on April 5, 2016. Ex. 9 (Van Pelt Patent). That the alleged proprietary information had been patented was determinative in *Deichmann*. "Patented information falls squarely under the contractual language 'public knowledge.' This particular patent was public knowledge at the time of the alleged disclosure in controversy here." 36 F.Supp.2d at 1171. Here, although Mike did not receive his patent until 2016, under the express terms of the NDA, any information about GXV's alleged proprietary design is now in the public domain by virtue of Mike's patent and not through any actions of Rodney.

## G.    GXV Cannot Prove Damages as a Matter of Law

In its Initial Rule 26 disclosures, GXV disclosed no damages related to any alleged breach of the NDA. Ex. 11 (GXV Initial Rule 26 Disclosures C). In its First Supplemental Rule 26 disclosures, GXV disclosed damages allegedly associated with the lost value of roof design but disclosed no documents on this issue. Ex. 12 (GXV First Supplemental Initial Rule 26 Disclosures C). As set out above, GXV obtained a patent on its alleged proprietary expedition vehicle design on April 5, 2016. Thus, GXV cannot establish as a matter of law any damages from any purported disclosure by Rodney since GXV obtained a patent and would have an action against any manufacturer infringing its patent.

### III.    <u>QUANTUM MERUIT</u>
(GXV Count I)

Defendant LoRoad is entitled to summary judgment on Plaintiff GXV's quantum meruit claim because GXV did not provide materials or services to LoRoad at LoRoad's request or upon LoRoad's acquiescence. GXV cannot prove that it provided anything of specific value to

31

LoRoad at LoRoad's request or acquiescence. GXV never demanded payment from LoRoad for any materials or services provided by GXV. In addition, GXV cannot prove it sustained any damage as a result of providing any materials and/or services to LoRoad at LoRoad's request or acquiescence.

**A.      GXV Provided No Materials or Services at LoRoad's Request or Acquiescence**

In order to state a claim for quantum meruit, GXV must prove that: 1) it provided materials or services to the defendant at the defendant's request or upon its acquiescence; 2) the materials or services had a certain reasonable value; and 3) it demanded payment but the defendant refused to pay the reasonable value of the materials or services. *Fowler v. Scott*, 164 S.W.3d 119, 120 (Mo.App. 2005).

GXV alleges that it provided LoRoad with materials consisting of a base vehicle. GXV alleges it provided LoRoad with services consisting of alterations to the base vehicle and engineering/design work. Ex. 1 (GXV Petition ¶55). There is no evidence to support GXV's allegation that it provided a base vehicle to LoRoad. There is no dispute about this fact. Accordingly, GXV's cannot prevail on a claim of quantum meruit with respect to the provision of a base vehicle.

GXV alleges that LoRoad "decided on" a BAE 6x6 for a base vehicle and "communicated that fact to GXV." Ex. 1 (GXV Petition ¶52). LoRoad never asked GXV to purchase a base vehicle before a final agreement would be in place. In fact, the evidence shows that LoRoad and GXV discussed times when GXV went out and purchased base vehicles for a good deal before it had signed contracts with buyers who subsequently walked away from the proposed build projects. GXV acknowledged that it bore the burden in those instances and that this type of situation is simply "a cost of doing business." Exs. "14" and "15" (LoRoad 43;

32

LoRoad 46). In any event, LoRoad never received a base vehicle from GXV and there is no genuine issue of material fact on this point. Accordingly, there is no evidence to support GXV's claim of quantum meruit with respect to the provision of a base vehicle or any alterations performed on the base vehicle.

GXV alleges that it provided LoRoad with engineering and design work at LoRoad's request. Ex. 1 (GXV Petition ¶55). However, GXV has never provided LoRoad with any engineering drawings or designs created specifically for LoRoad at LoRoad's request. GXV gave LoRoad a single basic floor plan drawing for a different model. Ex. 43 (LoRoad 103). The floor plan layout on the drawing GXV gave LoRoad did not reflect the layout or features LoRoad wanted. The floor plan layout was created and given to LoRoad before LoRoad and GXV even finalized potential floor plan layout and design ideas. In any event, GXV clearly cannot claim that floor plan constitutes proprietary or secret knowledge because they have posted it on their website for the entire world to see. Ex. 44 (GXV website). A brief comparison of the two makes it clear that this is the same floor plan.

Furthermore, it is undisputed that with respect to engineering and design work, the parties had agreed that LoRoad would not be obligated to pay for any such work until a final floor plan was approved. Ex. 45 (LoRoad 528, "Custom Floor Plan…Only changes to Floor Plan after approval of drawings will be billed at $75/hour…"). Engineering specifically for LoRoad's proposed build could not even be determined until there was an agreed-upon floor plan design. There is no dispute that a final floor plan design was never agreed upon.

**B.     GXV Never Made a Demand for Payment for Any Engineering or Design Work**

The final essential element of a claim of quantum meruit is the requirement that the plaintiff make a demand for payment of the reasonable value of materials and/or services

provided to the defendant at the defendant's request or upon its acquiescence. In this case, GXV never demanded payment from LoRoad for engineering or design work. Accordingly, the uncontroverted evidence shows that GXV cannot prevail on its claim of quantum meruit.

## IV. RESTITUTION/UNJUST ENRICHMENT
### (GXV Count II)

The elements of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation of such benefit; and (3) acceptance and retention of the benefit under circumstances that without payment would be inequitable. *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 536 (Mo.App. 2011). Furthermore, the benefits that plaintiff alleges are inequitably retained must be identified specifically. This requires proof of actual dollar amounts. *Hoffmeister v. Kranawetter*, 407 S.W.3d 59, 62 (Mo.App. 2013). LoRoad is entitled to summary judgment on GXV's claim for unjust enrichment because: LoRoad did not receive any engineering or design work product from GXV specific to LoRoad's proposed build; LoRoad has not benefited materially or unjustly from any purported engineering or design work of GXV.

## A. LoRoad Received No Engineering or Design Work Product from GXV

LoRoad has received no engineering or design work product specific to its proposed project from GXV. GXV has produced no evidence of providing LoRoad with any such work to date, even if it performed any work. As noted previously, GXV itself has stated that it does not begin engineering work until it has a contract in place. Here, there never was a mutually agreed upon contract. Even though GXV may argue it believed it had a contract from November 15, 2012 until February 13, 2013, GXV has no evidence it provided any engineering or design work product to LoRoad during that time period or at any time since then. The only evidence GXV can offer is Mike Van Pelt's self-serving deposition testimony in which he claims GXV "lifted its skirts" when Rodney visited GXV's facilities in the fall of 2012. Ex. 2 (M. Van Pelt Depo.

72:15-16). Yet, Mike was unable to articulate a single proprietary item disclosed to Rodney. Mike could not recall if he provided Lough blueprints during the site visit and he could not recall if Rodney took any notes during the visit. Ex. 2 (M. Van Pelt Depo. 157:23-158:8). In fact, Rodney did not receive any blueprints or other documents except for the single page floor plan for a different model discussed above, and he took no notes during the site visit. Ex. 8 (Lough Affidavit ¶7). Rodney took no photos during his visit at the GXV facility. Ex. 8 (Lough Affidavit ¶7). Rodney is not an engineer and has no engineering training. Ex. 8 (Lough Affidavit ¶8).

**B.      LoRoad Has Received No Specific Benefit From Anything GXV Allegedly Provided**

As noted above, GXV must prove that LoRoad unjustly accepted and retained a specific benefit conferred on it by GXV. Here, GXV has no evidence showing specifically what the alleged benefit actually is. GXV has produced no evidence of any dollar amount it claims LoRoad has benefited. The amount of any alleged benefit is therefore speculative. Accordingly, LoRoad respectfully requests summary judgment be granted in its favor on GXV's Restitution/Unjust Enrichment claim.

## CONCLUSION

For the reasons set out herein, defendants Rodney Lough Jr. and LoRoad, LLC move for summary judgment in their favor on all counts of GXV's Petition against them; and for such other and further relief as the Court deems just.

**ORAL ARGUMENT REQUESTED**

35

HUSCH BLACKWELL LLP

By: /s/ Bryan O. Wade
    Bryan O. Wade      MO Bar #41939
    Ginger K. Gooch    MO Bar #50302
    901 St. Louis Street
    Suite 1800
    Springfield, MO 65806
    Phone: 417.268.4000
    Fax: 417.268.4040
    Email:    bryan.wade@huschblackwell.com
             ginger.gooch@huschblackwell.com

Attorneys for Defendants LoRoad, LLC and
Rodney Lough, Jr.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument was filed this 24th day of October, 2016, with the Court's electronic notification system, which forwarded a copy to:

Andrew K. Bennett
A. Jay Preston
CARNAHAN, EVANS, CANTWELL
& BROWN, P.C.
2805 S. Ingram Mill Road
P.O. Box 10009
Springfield, MO 65808-0009
Phone: (417) 447-4400
Fax: (417) 447-4401
Email: abennett@cecb.com
        jpreston@cecb.com

/s/ Bryan Wade
Bryan O. Wade

36